[No. H029296. Sixth Dist. July 29, 2008.]

CITY OF HOLLISTER, Plaintiff and Respondent, v.
MONTEREY INSURANCE COMPANY et al., Defendants and Appellants.

**COUNSEL**

Long & Levit, John B. Hook and Irene K. Yesowitch for Defendants and Appellants.

Law Offices of Joel Franklin, Joel Franklin; Law Offices of Vincent P. Hurley, Vincent P. Hurley; and Stephanie A. Atigh, City Attorney, for Plaintiff and Respondent.

**OPINION**

**RUSHING, P. J.**—An old municipal building at the Hollister airport caught fire. The City of Hollister (City) sought to recover the building's "functional replacement value" under an insurance policy issued by Monterey Insurance Company (MIC). The policy provided that if City wished to recover such benefits, it must enter into a contract to repair or replace the building within 180 days after the fire. Throughout this period, however, MIC refused to confirm that it would honor such a claim, raised spurious grounds for its denial, delayed in communicating basic determinations affecting coverage, refused to disclose its best estimate of the functional replacement value, permitted City to labor under misapprehensions concerning its rights under the policy, and ignored communications from City seeking clarification of these and other matters. As the time to enter into a contract neared expiration, City brought this action to declare that MIC was estopped to assert the contracting provision in light of its own failure to cooperate in City's performance of the condition. The trial court found for City, and MIC appealed. To avoid a suggestion of mootness, we will modify the judgment to reflect the trial court's manifest intentions. Finding no reversible error, we will affirm the judgment as so modified.

BACKGROUND

## A. *Events Before Suit*

The Hollister Municipal Airport traces its origins to 1912, when an aviator took off from a pasture three miles north of the city. (2 Shettle, United States Naval Air Stations of World War II (1997) p. 91.) The site served as a crop duster's base until 1942, when the United States Navy made it an auxiliary air station. (*Ibid.*) In 1947 the United States deeded it to City. (*Ibid.*) Along with the grant went a number of wood-framed buildings constructed by the Navy. These included "Building 25," which the navy had apparently used as a post office, theater, and welfare office. The building was shaped somewhat like an E, with three wings extending northeast from a transverse element. The center wing, which is variously described in the record as an auditorium, theater, or gym, was longer and higher than the end wings. The record contains various estimates of the building's overall size, typically falling in the range of 18,000 to 19,000 square feet.[1]

Prior to the events giving rise to this action, Building 25 was occupied by at least three paying tenants. City was in the process of evicting a fourth tenant for nonpayment of rent. Another tenant was apparently in the process of taking up occupancy. The building was apparently also used for meetings of an airmen's association, a community club, and an Alcoholics Anonymous chapter.

The building was insured against fire under a commercial lines policy issued by MIC.[2] The policy included a "Functional Building Valuation" endorsement, which obligated MIC to pay the cost to repair or replace the building, but only if, within 180 days after the loss, City "contract[ed] for repair or replacement of the loss or damage to restore the building . . . for the same occupancy and use . . . ."[3] If City failed to satisfy this condition, it

---

[1] Some of the historical information in this paragraph is drawn from a draft report prepared for City in 1999 by Hemingway/Stock Associates, entitled "Hollister Municipal Airport Building Assessment." Although this document was apparently never offered into evidence, it was marked as an exhibit and authenticated by the then city manager, who testified that it was accepted by City in its draft form and became a public record. We do not suggest that its factual assertions would have been admissible over objection on a contested issue. We rely on it only for historical context.

[2] MIC was variously referred to below as Monterey Insurance Company, California Capital Insurance Company, California Insurance Group, Capital Insurance Group, and CIG. We need not concern ourselves with the distinctions, if any, between and among these entities.

[3] The endorsement provides in relevant part, "The following is added to the VALUATION Loss Condition: [¶] 1. If you contract for repair or replacement of the loss or damage to restore the building shown in the above Schedule for the same occupancy and use, within 180 days of

could only recover Building 25's "market value." The market value of Building 25 was never established, but was apparently estimated at around $150,000.[4] The cost to construct a functionally equivalent building apparently remains a subject of sharp dispute; the record contains estimates ranging from $950,000 to $2.6 million.

In late 2001, about a year before the fire in Building 25, MIC's risk assessment department inspected the airport buildings and prepared what was referred to at trial as an "underwriting request" or "underwriting recommendation." It reported the presence of "peeling exterior paint" on an unspecified number of airport buildings and recommended that "all unwanted and damaged paint should be removed and buildings be repainted." MIC sent a copy of the recommendation to City, and on March 7, 2002, City's then director of management services, Clayton Lee, returned a copy of the recommendation to MIC with a handwritten notation stating, "The City of Hollister is currently completing [a] . . . Master Plan for the renovation & rehabilitation of all facilities at the Hollister Municipal Airport. It is undetermined at this time whether or not the aforementioned facilities will be demolished or not. A determination is anticipated by the end of the spring. At this time, if the buildings will remain in use, the painting will be completed." The buildings were never repainted, but neither did City reach any decision to discontinue their use, let alone demolish them. Nonetheless, MIC renewed the policy effective July 1, 2002, increasing the number of buildings insured and the limit of liability for functional replacement coverage.

On Saturday, November 23, 2002, a fire occurred in Building 25, damaging a portion of it. The cause was ultimately determined to have been accidental. City reported the fire to its insurance broker on Monday, November 25. The

the damage unless we and you otherwise agree, we will pay the smallest of the following: [¶] a. The Limit of Insurance shown in the above Schedule as applicable to the damaged building; [¶] b. (1) In the event of a total loss, the cost to replace the damaged building on the same site, with a less costly building that is functionally equivalent to the damaged building; or [¶] (2) in the event of a partial loss, the cost to repair or replace the damaged portion of the building with less costly material, if available, in the architectural style that existed before the loss or damage occurred; or [¶] c. The amount you actually spend that is necessary to repair or replace the lost or damaged building with less costly material if available. [¶] 2. If you do not make a claim under Paragraph 1, above, we will pay the smallest of the following: [¶] a. The Limit of Insurance shown in the above Schedule as applicable to the damaged building; [¶] b. The 'market value' of the damaged building, exclusive of the land value, at the time or loss; or [¶] c. The amount it would cost to repair or replace the damaged building on the same site, with less costly material in the architectural style that existed before the damage occurred, less allowance for physical deterioration and depreciation. [¶] . . . [¶] F. The following DEFINITION is added: [¶] 'Market Value,' as used in this endorsement, means the price which the property might be expected to realize if offered for sale in a fair market."

[4] After litigation had commenced, an appraiser fixed the market value at zero. The trial court excluded this appraisal on the ground that it was prepared in the course of settlement discussions. This ruling is not challenged on appeal.

broker immediately notified MIC. MIC retained independent adjuster Roger Anderson, who wrote to city management services director Lee that "this claim was received November 25, 2002 . . . ." Anderson visited the fire scene, and on November 27 gave two senior MIC adjusters his opinion that Building 25 was a total loss. They told him that given the size of the loss "and what was involved," they would "have their own large loss adjuster take care of" the claim. Shortly after this conversation, Anderson asked Lee to "provide some documentation on the leases or loss of income issue . . . ." Lee provided that information within a few days of the request, and Anderson forwarded it to MIC.

On December 2, 2002, senior MIC adjuster Harve John Hagerty II assigned the claim to general adjuster Jack Boczar.[5] In testimony, Boczar agreed that a general adjuster's job is "to review coverage and determine damage and attempt to settle insurance claims . . . ." Boczar visited Building 25 with an engineer, Charles Swensen, on December 3, 2002. While there, according to Boczar, they were approached by a man who introduced himself as a demolition contractor. He expressed the desire "to present the winning bid to demolish the building," and said that "he had been working on a presentation like that prior to the loss." According to Boczar, the contractor said that the building had been "scheduled to be demolished" before the fire and that "the only reason it hadn't [already] been demolished . . . was that the city didn't have the funds to do so." Boczar testified that further details were provided by a janitor, who said that the building had been scheduled for demolition, that "the former airport manager had an airport master plan that called for dealing with the buildings at the airport," that about four years before the fire "some engineers looked at the building and set up some requirements for repairs to be effected at the building," that the repairs "were never effected," and that about two years later "another set of engineers or city engineer looked at the building and determined that since the original repairs had not been effected . . . , that the building was now not economically repairable and was going to be . . . was being considered for demolition in the airport master plan."[6] Boczar attributed similar information to other unidentified persons at the scene. He testified that a group of people working on planes in a hangar "said the same thing that everybody else told me, that the building was an eye sore [sic], and that it was scheduled to be demolished." "Everybody that I spoke to at the loss location told me the same story, that it was common knowledge that this building was going to be demolished. Everyone I spoke to." These conversations were not recorded in his notes, he said, "because it was common knowledge. Everybody told me the same thing."

[5] The "c" appears to be silent; in one hearing transcript the name is transcribed "Bozar."
[6] Swensen's impression was that the janitor "really didn't know what the plans were . . . ."

Boczar further testified that while at the scene he encountered the tenant who had been in the process of eviction at the time of the fire. As he recalled the conversation at trial, the tenant told him he was being evicted, but did not tell him the reason.

On December 4, 2002, Boczar wrote a note to his file describing his visit to the site and related developments. He made no mention of the tenant's being evicted. He did write, however, that during his "investigation" he had "found that this structure had been slated for demolition for the past two to three years," that the airport manager "had been obtaining bids to effect the demolition for the past two years," and that "[t]he demolition was not completed prior to his retirement due to the lack of city funds." He also noted the presence in the file of the underwriting recommendation in which Clayton Lee had alluded to the possibility of demolishing some of the airport buildings; Boczar described this as a "note in our underwriting file . . . that discusses the knowledge of the possible demolition of the building." He further opined that a "functional replacement" for Building 25 would consist of a metal building including a gym with fir flooring. He wrote that he had asked Swensen to "obtain pricing" for a structure of 19,084 square feet in this configuration.

Also on December 4, 2002, Boczar met with City's deputy director of public works, Lawrence Jackson. According to Boczar, he told Jackson "what [he] had learned about Building 25 from people at the loss site," presumably meaning about plans for demolition, and Jackson did not "indicate disagreement" with these reports. Boczar testified that Jackson also told him there was a moratorium on new sewer and water hookups in Hollister, but that since Building 25 had an existing hookup, a new building could be constructed there. They did not discuss the possibility of repairing the building but instead discussed its demolition at MIC's expense. After the meeting Boczar wrote, in a second note to the file, "At present it appears that this loss will be concluded on a fair market basis plus the cost of demolition and debris removal."

A week later City's insurance broker, Deanna Darling, sent a fax to Dallas Harrison, of MIC's home office, indicating that that "there seems to be some confusion on how this claim is being handled." The fax was apparently triggered by a discussion of building values at the time management services director Lee turned over copies of leases to outside adjuster Anderson. At that time Anderson evidently mentioned the figure of $150,000. In her fax, Darling wrote, "[A] gentleman from ASU . . . has mentioned to the insured that they will replace the building for $150,000. This is a huge problem . . . ."

Senior adjustor Hagerty told Boczar to respond to Darling's fax. Boczar called Darling's assistant and, according to his report to the file, "informed

her that I was the adjuster of record and that no determination had been made as to what was owed to this insured for this loss. I informed her that we were aware that there was functional replacement coverage on the building however *I had not yet determined if it was applicable*. No decision had been made as to how this claim was to be handled at present. If we found that we owed functional replacement we would of course pay it. I informed her that I had a question as to what we owed for a building that was determined to not be economically repairable and *quotes being obtained for its demolition. What loss did the insured in fact sustain?*"[7] (Italics added.) Under cross-examination, Boczar added that he told Darling's assistant, "if they wanted to make a claim, they could," that "claim" meant "enter into a contract," and that "if they did enter into a contract, [MIC] would have their attorneys decide whether or not there was coverage . . . ."

As indicated above, Boczar had already been considering what would constitute a functional replacement building and what it would cost to construct it. On December 12, 2002, he wrote to the file that engineer Swensen had just given him "initial figures for a functional replacement building," which were "now co[m]ing in at $1.1 to $1.2 million," but without a fir-floored gymnasium. Boczar told Swensen to try to get these figures lower, since Boczar believed the replacement figure should "come in at just under $1 Mil." Swensen's estimates were never communicated to City.

Some time in December 2002, MIC began preparing a letter to, as Boczar testified, "spell out the coverage under the policy and . . . inform [City] of the conditions for functional building valuation endorsement and provide them with a copy of that endorsement as it appeared it hadn't been provided to them in the renewal policy."[8] Although the letter ultimately went out over Boczar's signature, it was largely if not entirely drafted by MIC's attorney, Patrick Bailey, and reviewed by Hagerty.[9] The letter did not go out until January 8. It opened with the statement that MIC was "continuing its investigation of the claim presented by the City of Hollister" for damage to Building 25. It then continued, "During the last renewal process, we were informed that the building was to be demolished. Please provide me with any documents that discuss any demolition plans or concern the scheduling of any demolition activities. . . . [¶] It is our understanding that at the time of the

---

[7] This appears to be the first mention of what we will sometimes call the "demolition defense," that is, the idea that if City was planning to demolish Building 25, it could not recover functional replacement value for the building's accidental destruction.

[8] In his review of the file, Boczar had discovered that the functional replacement endorsement was not transmitted to City with the most recent renewal of its policy.

[9] Boczar insisted at trial that he wrote "parts of" the letter as finally mailed, but he had testified in deposition that the language was Hagerty's. Hagerty testified only that he had "some input into the drafting of [the] letter" and that it was his decision to send it over Boczar's signature.

fire, the City of Hollister was in the process of moving existing tenants out of the building so that the demolition of the building could proceed. . . . [¶] We are investigating the cause and origin of this fire and will share the results of that investigation with you once it is completed." The letter requested that City provide copies of "correspondence . . . concerning the need for [tenants] to vacate the building," and "plans, proposals, or contracts for the replacement of the building, if any, which would have been considered and/or implemented by the City of Hollister had the building been demolished prior to the fire." It also asked City to "identify tenants who occupied the building at the time of the fire" and provide "information . . . concerning when they planned to vacate the premises."[10]

After noting the existence of coverage under the functional building valuation endorsement, the letter drew attention to the 180-day time limitation. This was followed by a reservation of rights: "By investigating the fire and the claim submitted by the City of Hollister, Monterey Insurance Company does not waive any right or defense under the policy or the law. All such rights and defenses are reserved without limitation."

Upon receiving the January 8 letter, Lee asked Jackson if there was information of the type requested in the letter, and if so to "get it for [him]." In response, Jackson sent Lee an e-mail message concerning information about any plans that might have existed to demolish Building 25. Beyond the bare fact of this communication, little about it was allowed into evidence.[11]

On January 27, 2003, Boczar met with Jackson and Lee for about one and a half hours in Lee's office. Lee and Boczar gave widely divergent accounts of this meeting. According to Lee, Boczar seemed "pretty aggressive" in the meeting, insinuating that Lee and Jackson were "trying to make statements that were not accurate." He insisted "that people were being moved out of the building so the city could demolish the building." Jackson and Lee "told him that was inaccurate," and that a tenant had been under process of eviction for

---

[10] So far as this record shows, City had complied with this inquiry within a few days of the fire when Lee gave copies of leases to outside adjuster Anderson.

[11] The document was offered by MIC, and excluded, apparently, on grounds of hearsay and relevance. Of course Jackson's own statements about the existence or nonexistence of plans to demolish Building 25 were as relevant as the other evidence received on that subject, which was considerable. When offered by MIC, they were also admissible over a hearsay objection as statements authorized by a party. (See Evid. Code, § 1222.) City's only colorable objection was that *Boczar's statements* to Jackson, as recapitulated by the latter, were hearsay. This would at most have been grounds for limiting the purposes for which those statements were admitted, or conceivably for excising them. Instead the court excluded the whole document. The irony of this ruling is that the document in its entirety, including the portions counsel apparently found objectionable, seem to us more supportive of than detrimental to City's case. Perhaps for that reason, MIC has not challenged the court's ruling on appeal.

nonpayment of rent. They also told him there were no documents of the type described in his letter of January 8. Boczar appeared to express disbelief. He accused them of having knowledge contrary to what they were saying, and expressed the desire to take their recorded statements.

Lee further testified that once Boczar clarified the functional replacement provisions, which Lee had not initially understood, Lee and Jackson "made it very clear . . . that the city wanted to [move] forward with a functional replacement of the building." When Lee expressed the desire to pursue that approach rather than fair market value, Boczar replied, "I will fight that one." Lee took this to mean that Boczar "was going to recommend to his higher ups that they deny the claim." According to Lee, the meeting also included discussion of the 180-day time limit. Lee and Jackson asked Boczar about "the potential of an extension because I think Mr. Jackson was concerned about the 180 day period of time." He believed that Boczar replied that "they wouldn't extend."

At some point during the meeting Boczar and Jackson traded estimates of the likely functional replacement cost. "Mr. Boczar was talking about somewhere I believe less than a hundred dollars a square foot. I think it was 65 to 75 dollars a square foot.[12] And . . . Mr. Jackson off the top of his head was at a much higher rate. I think it was two hundred dollars a square foot." There was also "a discussion about lawyers getting involved." Boczar indicated that he was willing to pay $100,000 to $150,000 "for the fair market value," but did not propose any number for functional replacement "because he told us he was going to fight it."

Boczar testified that Lee and Jackson explained their failure to provide requested documents not by saying that such documents did not exist, but that they "didn't have the time to get them." He did not form the impression that "there were no documents."[13] Although he testified that he did not find the meeting "antagonistic," he acknowledged asking to take Lee's recorded statement. This conformed to his written report of the meeting, in which he wrote, "I informed Mr. Lee that I was prepared to take his recorded statement

---

[12] Even at $65 a square foot, the value of an 18,000-foot building would be nearly $1.2 million. The value of a 19,000-foot building at $75 a square foot is over $1.4 million. Meanwhile Boczar was attempting to jawbone MIC's own consulting engineer, Swensen, into providing an estimate below either of these figures.

[13] This testimony was arguably contradicted by Boczar's contemporaneous written report, in which he wrote only that Jackson and Lee "had no documentation that we requested in our letter of 1-8-03." It was squarely contradicted by Lee in rebuttal testimony: "Q. Let me represent to you that it has been stated in this court that you told . . . Mr. Boczar that you had not had time to look for the documents so you didn't have any at the meeting. Is that a true statement? [¶] A. No. That's not a true statement. [¶] . . . [¶] Q. Did you ever say anything about not having time to look for documents? [¶] A. No. Absolutely not."

on the spot to obtain any information that he had in reference to demolition plans or thoughts." Although Boczar professed not to have sensed disagreement by Lee and Jackson with the rumors of planned demolition he had heard, he explained his references to a recorded statement by testifying that "Mr. Lee had stated that no final determination, no determination had been made by the city if the building was going to be demolished."

In Boczar's written report on the meeting, he acknowledged that he told Lee and Jackson he would "resist" a functional replacement claim "on a building that was being considered for demolition . . . ." He added, however, that "they certainly had the right to present a claim for replacement." He also wrote, "Mr. Jackson stated that the remaining 120 days did not give the city enough time to do anything other than a turn key [*sic*] bid proposal for the replacement of the building. This would allow for design and construction in one bid. They could do it if necessary but would rather not if possible. [¶] We discussed the time limit and I informed them why we could not waive policy conditions for them as that would place us in a position to waive them for others in the future. . . . [¶] They asked that I give them two weeks to meet with the city counsel [*sic*] and see if they can get approval to negotiate a settlement. They gave no indication if the city counsel [*sic*] would grant such approval. [¶] We now await their response. Should we not reach a settlement agreement, I will contact architects, construction consultants, and contractors to submit reasonable bids for a functional replacement building. [¶] Per our discussion we may even retain an architect to comprise specifications for a functional replacement building and submit to the city to assist the insured."

Boczar's superior, Hagerty, testified that when he saw the sentence in Boczar's report about resisting a claim if demolition had been under consideration, he "called up [Boczar] and instructed him that in the event we find that demolition was being considered but not actually on a calendar for demolition that—and the insured actually presented its claim under the terms of the building valuation endorsement for functional replacement cost, that we would be obligated to pay that claim." Boczar testified that Hagerty told him "we should refrain from resisting a claim for functional replacement cost at that point." Hagerty nonetheless believed that issues remained, in particular the "serious variance" between the parties' views "on the amount of the claim." He indicated to Boczar that he should "focus [on] dealing with the apparent gulf between our initial read on what the functional replacement value might be and what the city was telling us it . . . would likely present in the way of a functional building value, replacement cost claim." Apart from Hagerty's testimony, there was no evidence that MIC abandoned the demolition defense at that time, or indeed ever did so—let alone communicated that abandonment to City.

At Hagerty's instruction, Boczar engaged an architect to prepare plans for a replacement building. City was not informed of this engagement. On the contrary, Boczar instructed the architect "that [he] did not want her to be nosing around the building or asking any questions if she went out to the location . . . ." Asked at his deposition to explain this instruction, he testified, "I didn't want to give the city the impression that at this point I was . . . going to accept a functional replacement cost claim. I was still of the impression and like I am that they weren't entitled to a functional replacement cost claim. But I wanted to be prepared should they submit one."[14] (Italics added.)

As a result of the January 27 meeting, and on that or the next day, Lee and Jackson met with interim city manager Ed Kreins and the city attorney. Lee told Kreins "that I had a very unsettling feeling about the way the meeting went. I felt that we were going to get . . . the short end of the stick on this thing. I did not like the aggressive nature and some of the misinformation that Mr. Boczar was asserting in our conversation and the letter previously. [¶] I provided, I believe, a copy of the letter to the city manager . . . ."

Up to this point City had not engaged counsel, but shortly thereafter it retained Attorney Vincent Hurley to represent its interests. Inferentially, City officials also communicated their concerns to City's broker, Deanna Darling, who on January 29 sent a fax to MIC stating that she and "[t]he insured" were "very unhappy with the way this claim is being handled," and requesting immediate action "to get some closure, settlement, and organization process with this claim. [¶] We would like to ask that Jack Boczar be taken off this claim immediately and a claims supervisor be appointed. Mr. Boczar has been very unprofessional with the handling of this claim and you may feel free to contact me to clarify and expand on that statement. [¶] Second we need to get back to the facts of this claim. There has been way too much 'should have been' and 'what ifs' been [sic] brought up. The fact of this claim is the insured has a policy written with a limit of $1,052,480 [sic] with functional replacement cost for this 19084-sq ft. building. This is where the insurance needs to start kicking in. This is where [MIC] needs to begin this claim and do everything possible to replace this building per the policy limits and coverages. [¶] The insured is now greatly worried and concerned about the 180-day clause, so much that they are now bringing in their city attorney. [¶] Please process this request immediately, contact the insured, and start the process of helping the insured replace this building as soon as possible."

---

[14] Although this testimony appears garbled, the phrase "and like I am" could certainly be understood by the trial court to mean that as late as his deposition, Boczar still considered City disqualified from functional replacement coverage based on the demolition defense.

On January 30, MIC wrote to Darling, with copies to Lee and Jackson, asserting that "questions" remained concerning "the viability of claims for fire loss to a building that was being vacated for planned demolition before the fire . . . ."[15] The letter alluded to additional unresolved questions, including but "not limited to," unspecified "policy administration issues," City's ability and willingness to "perfect a claim for loss at Functional Replacement Cost in accordance with policy conditions," and "the true amount of loss under the valuation options provided for under the Functional Building Valuation Endorsement." Alluding to the November 2001 underwriting recommendation, the letter continued, "As you are aware, Monterey Insurance Company was informed by Mr. Lee in writing on March 7, 2002, regarding the City's plans to demolish the building involved in the fire." It then stated that "investigation and adjustment is [*sic*] proceeding subject to reservation of rights. Upon completion, a determination will be made regarding the obligations of Monterey Insurance Company for the City of Hollister's November 23, 2002 loss. . . . [¶] No decision as to the settlement of this claim will be made until a formal claim is presented to the Monterey Insurance Company by the insured. At this time, nothing precludes the City of Hollister from presenting a functional replacement cost claim pursuant to paragraph 1 of the Functional Building Valuation Endorsement. Likewise, nothing precludes the insured from making a claim for 'market value' or otherwise under paragraph 2 of the endorsement."

The letter concluded with the statements, "Please contact me [i.e., Boczar] after Monday, February 3, 2003 if you wish to discuss this matter, as I am currently in process of a physical office move until that time. If you need assistance in the interim, feel free to contact John Hagerty, telephone number [omitted], at Monterey Insurance Company's Home Office in Monterey."

Underlying the reference to an "office move" was the fact that Boczar was himself moving from Visalia to Sacramento. Hagerty testified that Boczar was a "resident general adjuster," meaning that "he worked out of his residence. He goes out and gets a post mail box to be a mail drop to sign for him and accept things and keep it for him. [¶] In this instance, you know, Mr. Boczar

---

[15] Although the letter went out over Boczar's signature, it was apparently written by Hagerty, who referred to it in testimony as "my reply of January 30th . . . ." Later he testified, "I responded on the very same day that I received the fax of January the 30th," and that he left Darling a "message that my follow up letter was coming." Boczar, for his part, testified that the letter was "written in my name" and denied knowing whether he actually signed it. He agreed he might not have seen it before it was sent.

In its brief MIC characterizes this letter as a "status report." At no time did MIC favor City or any of its representatives with anything resembling a status report. With the exception of its letter of January 8, 2003, the purpose of which was to put City on notice of the terms of the functional replacement endorsement, every written communication from MIC to City was a reaction to a communication from City.

after relocating would terminate the old post mailbox with a forwarding order and then start up his new post mailbox." Apparently Boczar did not arrange for forwarding of his mail until February 28, when it was suggested to him by City's attorney, Hurley.

Lee received his copy of the January 30 letter on February 3, 2003—the date Boczar was supposedly reachable again—and turned it over to the city attorney. The letter made its way to outside Attorney Hurley, who wrote a reply dated February 10 to Boczar at his Visalia address. After noting that he represented City on the claim, and that all further correspondence should be directed to him, Hurley wrote, "1. You assert that the building was scheduled to be, or that the City had plans to, demolish the building. That is not true. There are no documents responsive to your request. [¶] 2. You assert in your letter that the City was moving tenants out of the building in order to demolish the building. That is not true. There are no documents responsive to your request. [¶] 3. You assert that the City of Hollister had plans to replace the building before it burned in November 2002. That is not true. There are no documents responsive to your demand." In response to the January 30 letter, he wrote that MIC was "required to keep the insured fully informed and to complete your investigation and adjustment in a timely manner." He then requested responses to 10 numbered points and issues, including identification of all outstanding issues concerning coverage, enumeration of all " 'policy administration issues' " and a statement of "your valuation and/or position on the true amount of the loss under the valuation options provided for under the Functional Building Evaluation Endorsement that your refer to in your letter to Ms. Darling."

Hurley further wrote, "The City would like to contract to replace its building. However, it cannot enter into a contract to replace its building because the insurance company is delaying and not cooperating. By your letter, you acknowledge that, in over 70 days since the claim was submitted, you have only been to the site twice and have only contacted City officials two times. You have done nothing to assure that the insurance company is going to honor the claim by its insured." He further asserted that the functional replacement endorsement entitled City "to replace the damaged building on the same site," but permitted MIC to "insist that the building be replaced with a less costly building . . . . What would you like? You have given no advice to the City on this subject. What is your idea about a less costly building that is functionally equivalent to the damaged building?" He went on to assert, "It is beyond argument that the cost to replace the building with a less costly building that is functionally equivalent will exceed the

limits of the policy.[16] Therefore, it is the duty of Monterey Insurance Company to confirm that it will pay the limits of the policy, or tell the City what estimate you have received for replacing the building . . . . We cannot even demand an appraisal until we know there is a dispute."

Hurley concluded by asking MIC to "respond in writing to each of the points set forth above and notify us of the date that you intend to conclude your investigation and adjustment of this claim . . . . Finally, please tell me in writing your position as to whether or not the building is [a] total loss and replacement cost exceeds the policy limits under the functional building valuation. Because this claim has been delayed for over 70 (seventy) days now, I hope that you will respond to this letter in writing within the next 7 (seven) days."

MIC failed to respond to this letter until April 30, 2003, more than 11 weeks after it was written. On February 28, Boczar telephoned Lee, who referred him to Hurley. Boczar sent Hurley an e-mail stating in part, "Mr. Lee informed m[e] that you have sent me a letter to my Visalia P. O. Box, but I have not received any correspondence from you to date. I have moved recently to the Sacramento area . . . ." After supplying new contact information he wrote, "I travel frequently so at times I maybe [sic] difficult to contact. The cell number is usually the best. [¶] I look forward to hearing from you; hopefully, we can attempt to bring this matter to a conclusion." Hurley faxed Boczar a copy of the February 10 letter, to which Boczar replied by e-mail, acknowledging the requested seven-day limit for a response but saying, "Unfortunately I am in the process of leaving for a meeting in the [B]ay [A]rea now; and am not able to give it the proper attention. . . . [¶] . . . [¶] I'm sorry for any delay this may have caused and will do all i[n] my power to respond to your letter as quickly as possible."

In fact Boczar needed time not to give the letter his own attention but to send it to MIC's coverage counsel to, as Boczar testified, "draft up a response." Hagerty appeared to testify that Attorney Bailey sent Boczar a draft reply on March 13, two weeks after Boczar received Hurley's faxed letter of February 10. Nothing happened until March 18, when Hurley wrote to Boczar noting the lapse of 35 days since his February 10 letter and demanding a written response within five days. He sent a second, seemingly identical letter on March 21, 2003. On that same day he sent a third followup letter, writing, "It will be impossible to enter into . . . a contract [for a replacement building] by May 22, 2003, given that there has not been a

---

[16] As will appear, this conclusion—which may have originated with broker Darling—was erroneous. In fact the policy limits comfortably exceeded the highest estimates of the building's functional replacement value.

determination by the insurance company on coverage, and given the implications of your letters that the insurance company does not believe that the City suffered a loss, and does not believe that the City has a functional building. [¶] *We cannot enter into contracts with the uncertainty created by the lack of adjustment of this loss to date.* [¶] I again request that you respond to my letter of February 10, 2003. I also request that the insurance company enter into an agreement with the City of Hollister to extend the 180-day time limit for entering into a contract for repair or replacement of the loss."

Still nothing was forthcoming from MIC. Indeed, the last three letters went unseen for some two weeks because Boczar, to whom they were sent with return receipts requested, did not pick them up at the post office until April 8, 2003. Then, he testified, he "lost" them. On April 29, Hurley called Hagerty's supervisor, who promised that Hagerty would call him back, which Hagerty did. As a result of this conversation, Hurley faxed copies of his three March letters to Boczar, who faxed them to MIC's attorney.

On April 30, Boczar finally faxed Hurley a reply to his February 10 letter. This communication was sent over Boczar's signature, but like its predecessors it was written by Hagerty, by Attorney Bailey, or both.[17] It blamed all difficulties in the matter on City's failure to "determine[] what claim it wishes to present and provide[] the necessary information required for us to evaluate that claim." It asserted that neither Boczar "nor anyone else connected with the Monterey Insurance Company has done anything to delay the investigation and adjustment of this claim." In response to Hurley's numbered questions, it stated that the "policy administration issues" alluded to by Hagerty in Boczar's ghostwritten letter of January 30 consisted of "the confirmation of how the building was insured and for what amount." It then continued, "Those issues have now been resolved as far as I am concerned. The building was insured on a blanket basis, with several other buildings located at the airport, under the functional replacement-cost basis with a policy limit of $7,258,900.00."

In the letter MIC explicitly refused to state a "position concerning the amount of loss under any of the valuation methods presented in the policy." It alluded to Boczar's supposed statement to Lee and Jackson that he "thought the cost of an 18,000 square foot metal building erected on a concrete slab might cost [*sic*] between $950,000 and $1,100,000." However, it stated that Boczar would not determine MIC's actual position "until I have reviewed the claim presented by the City of Hollister." Implicitly disclaiming any responsibility to provide figures, the letter stated, "The City . . . can do whatever it

---

[17] At trial Boczar testified that he "assume[d]" authorship was a "combination" of Hagerty and Bailey. When asked in deposition if the letter was "written by the insurance company's lawyer," he replied, "I believe so."

wants concerning the replacement of the building, subject to the requirement that the building be restored or replaced for the same occupancy and use. The policy sets forth theoretical amounts that might be owed should the City elect to replace the building. . . . It is for the City . . . to decide whether to repair or replace the building, and how much to spend to do the work. The policy merely describes how the amount owed might be measured and calculated." The letter acknowledged that City had "provided notice of the loss and its intent to present a claim for that loss, as required by the policy," but continued, "As noted above, [City] has not complied with the policy requirements concerning the presentation of its actual claim."

On the same day—April 30, 2003—Boczar sent Hurley a fax, at Hagerty's instruction, "[r]esponding to your letter of March 21, 2003, requesting that Monterey Insurance Company consider an extension of the 180-day time period . . . ." It stated, in pertinent part, "The Monterey Insurance Company is not obligated to extend the 180-day period set forth in the policy, but can agree to do so. In an abundance of good faith, and without prejudice to or waiver of any policy defenses or provisions, Monterey Insurance Company will agree to a ONE-TIME extension of SIXTY DAYS (60 days) beyond the 180 days provided for in the policy for the insured to comply with the terms of this endorsement. [¶] This extension will extend the date for the insured to contract for repair or replacement of the building in question for the same occupancy and use to July, 22, 2003."

On an unspecified date in May 2003, city officials held a meeting to discuss how to "quickly get into a contract for the replacement of that building." On May 12, Hurley wrote to Boczar taking issue with some of the statements in the April 30 letter, particularly its denial that MIC had delayed handling of the claim. He alluded to the statement in Boczar's January 30 letter that "investigation and adjustment [are] proceeding" when in fact MIC appeared to be conducting no investigation, but at best waiting for City to refute assertions originating from unidentified sources. He also wrote that MIC's "accusation of dishonesty two months after the fire and after no investigation has caused a delay of over three months while waiting for the decision you said you were going to reach after your investigation and adjustment were completed." He wrote that City would "proceed with preparing a claim," but considered MIC's conduct "to be the sole and only factor in delaying the processing of this claim."

Upon receipt this letter was forwarded to Attorney Bailey, who prepared a response that was ultimately sent on July 2. Before that, however, Hurley sent another letter to Boczar, dated June 13, 2003. In it, he stated that City had "retained engineering consultants and architects to prepare the preliminary plans for developing specifications for a functional replacement of the

destroyed building," but that these consultants had told City that "even on the fastest of fast tracks, specifications and architectural drawings cannot be completed by July." Even if the plans could be completed, he continued, "the design review, airport commission review, and architectural review cannot be completed by July." Indeed, he wrote, "Even if the City had started this process on the day after the fire, they could not have completed the process." "[T]he reason for the delay to this point," he wrote, "has been solely the responsibility of [MIC], who went off on a tangent claiming that the City officials were dishonest, the City intended to demolish the building, and they had 'witnesses' who could testify the City intended to demolish the building." He then "propose[d] that the functional replacement cost 'time limit' to enter a contract be extended for one year so that the City can enter into a contract to reconstruct the building with a functional replacement," adding, "If the insurance company will not agree to an extension, then we must go to court to seek declaratory relief." The letter concluded, "[T]he City proposes to extend the time limit for entering into a contract to July 21, 2004. Please provide notice within seven (7) days of the date of this letter if [MIC] will agree to the extension of time. If it will not agree, then we will go forward with legal action based on the facts of this claim and the legal issues specified above."

Upon receiving this letter, Boczar sent it to MIC's attorney. On July 2, Attorney Bailey wrote to City on behalf of MIC refusing to extend the contract time limit.[18]

## B. *Proceedings Leading to Appeal No. H029296*

On July 17, 2003, City commenced this action by filing a complaint for declaratory relief against MIC and an associated entity. It prayed for "a judicial determination of its rights and duties" under the policy "to allow Plaintiff to complete the public bidding process and execute a construction contract to build a functional replacement." Defendant moved unsuccessfully for judgment on the pleadings, and then filed an unverified answer generally denying the allegations of the complaint and asserting eight affirmative defenses, including that City had failed to satisfy a condition precedent to MIC's performance, and that City's failure to contract for repair excused and waived MIC's performance.[19]

The trial consumed five days, after which the parties exchanged posttrial briefs. The trial court issued an intended decision concluding that MIC was

---

[18] See discussion at page 505, *post*, concerning the trial court's exclusion of this letter from evidence.

[19] With two exceptions not applicable here, any answer to a complaint filed by a public entity must be verified. (Code Civ. Proc., § 446, subd. (a).) A general denial is not appropriate in a verified answer. (See *Williamson v. Clapper* (1948) 88 Cal.App.2d 645, 647–648 [199 P.2d

estopped to rely on the 180-day time limitation, and that City was entitled to coverage under the functional replacement endorsement. This was followed by a statement of decision including the following findings: "27. [City] did not possess sufficient funds to 'front' the cost of replacing Airport Building no. 25 and did not enter into a contract to replace the building because it was concerned that [MIC] would deny its Functional Replacement claim based on Mr. Boczar's statement that he would fight any such claim and [MIC's] subsequent failure to respond to the issues raised in the February 10, 2003, March 18, 2003, and March 21, 2003, letters. [¶] 28. [City] believed that [MIC] would deny its Functional Replacement claim for Airport Building no. 25. This belief was reasonable in light of Mr. Boczar's statement that he would fight any Functional Replacement claim, [MIC's] statements that [City] had intended to demolish Airport Building no. 25 and [MIC's] failure to respond to [City's] February 10, 2003, March 18, 2003, and March 21, 2003, letters despite Mr. Boczar's statement that the issues raised therein would be given 'proper attention.' [¶] 29. [City] was ready and willing to enter into a contract to replace Airport Building no. 25 within the Policy's 180 day deadline. [¶] 30. [MIC's] conduct prevented [City] from entering into a contract to replace Airport Building no. 25." The court declared City "entitled to coverage under the Policy's functional replacement provisions, up to the applicable limit of insurance, provided that it enters into a contract to replace Airport Building no. 25." On the same day, the court entered a judgment decreeing, "Defendants are estopped from enforcing or otherwise relying on the 180-day provision contained in Commercial Insurance Policy no. 8-SSP-3-981989 in connection with Plaintiff's claim concerning the Hollister Airport Building no. 25."

MIC moved to set aside the judgment or modify it in various respects. City opposed the motion, but offered to stipulate to a modification declaring City entitled to functional replacement coverage, " 'provided that it enters into a contract to replace Airport Building 25 within 180 days after notice of this amended judgment.' " MIC accepted the offer. The court denied the motion to vacate but amended the judgment to provide, in accordance with the stipulation, "Defendants are estopped from enforcing or otherwise relying on the 180-day provision contained in Commercial Property Insurance Policy no. 8-SSP-3-981989 in connection with Plaintiff's claim concerning the Hollister Airport Building no. 25, provided that Plaintiff City of Hollister enters into a contract to replace Airport Building no. 25 within 180 days after notice of entry of this Amended Judgment."

MIC filed a timely notice of appeal from the amended judgment.

337]; *Davis v. State Bar* (1983) 33 Cal.3d 231, 239 [188 Cal.Rptr. 441, 655 P.2d 1276].) Nothing was made at trial, however, of MIC's failure to verify the answer or its use of a general denial.

C. *Proceedings Leading to Appeal No. H030161*

On December 9, 2005, City filed a motion to stay the amended judgment pending MIC's appeal or to confirm that the judgment was automatically stayed by the filing of the appeal. In support of the motion, City's Attorney Hurley declared that City had, "at considerable expense," engaged an architect who had "completed . . . plans and specifications and . . . an . . . estimate of costs for Functional Replacement of Building 25 . . . ." The plans had been approved by the city council and submitted to MIC in conformity with a request by it "that it be allowed to review the specifications and plans." City had then submitted an architect's statement of probable costs to MIC pursuant to a confidentiality agreement between the parties. MIC's attorney had responded with nine objections to the proposed building and a warning that City "should be aware of potential issues with respect to the extent to which the proposed building exceeds what might be allowable under the policy, assuming eligibility for the cost of a functionally equivalent building." In further correspondence he took the position that the amended judgment was not stayed by the appeal.

MIC opposed the stay motion, contending that (1) City was "attempt[ing] to alter the judgment," by asking the court to "ignore or set aside the stipulation," which City itself had proposed, amending the judgment to require a contract within 180 days after entry of judgment; (2) the amended judgment was self-executing and thus not subject to the general rule that proceedings in civil actions are stayed by an appeal (see Code Civ. Proc., § 916, subd. (a)); (3) to permit the alteration contemplated by the motion would be "completely unfair" in that it would "allow the City to frame the terms of a judgment making it easier to defend on appeal and then undertake to have the judgment expanded to give it further rights." In reply City argued, among other things, that the order was not self-executing and that without the court's confirmation that the judgment was stayed, "the parties will be left to fight another, new argument by the insurance company to thwart coverage."

The court granted the motion and entered an order stating (1) "the Court finds that the provisions of California Code of Civil Procedure section 916 apply to the Judgment in this matter, and the Judgment is automatically STAYED pending the Defendants' appeal," and (2) "in the case of any confusion as to the applicability of California Code of Civil Procedure section 916 to this case, the Judgment is STAYED pending the appeal." MIC filed a timely notice of appeal.

DISCUSSION

## I. *Mootness; Effect of Stay Order*

We must first consider a difficulty arising from the limited duration of the estoppel imposed by the amended judgment, which decreed that MIC was estopped to assert the 180-day contract condition for a period of only 180 days after notice of entry of judgment. Notice of entry of judgment was given on August 15, 2005. By the terms of the judgment, the estoppel lifted 180 days later. Meanwhile, however, MIC had cast the effect of the judgment into doubt by filing this appeal, which raised the possibility that the judgment might be reversed and any entitlement arising thereunder vitiated. This left the City in essentially the same position it occupied at the commencement of the lawsuit. On the other hand, it now appears that even if the judgment is affirmed, it may be found to have lost effect by operation of its terms. This possibility renders the present appeal arguably moot, since it is possible that neither a reversal nor an affirmance will affect the substantive rights of the parties. (See *Covina Union High School v. California Interscholastic Federation* (1934) 136 Cal.App. 588, 589–590 [29 P.2d 323] [appeal from decree enjoining conduct during then current football season, dismissed as moot after season ended]; *Kenneally v. Knox* (1960) 184 Cal.App.2d 262, 265 [7 Cal.Rptr. 370] [by time of appellate decision, challenge to order granting custody for single one-month period had "by lapse of time become moot," such that "no justiciable controversy now exists"]; but see *American Civil Liberties Union v. Board of Education* (1961) 55 Cal.2d 167, 182 [10 Cal.Rptr. 647, 359 P.2d 45] [appeal from judgment confirming plaintiff's right to use school facilities for specified period was not rendered moot by expiration of period; plaintiff continued to assert right to use facilities for current and future periods]; *Lemat Corp. v. Barry* (1969) 275 Cal.App.2d 671, 673, fn. 2 [80 Cal.Rptr. 240] [although permanent injunction had expired before appeal decided, "the issues here raised are of sufficient public interest and, therefore, not moot"].)

■ Ordinarily, a moot appeal will be dismissed. (See 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 642, p. 669.) Although the parties have not raised the question of mootness, the court may examine a suggestion of mootness on its own motion. (See, e.g., *Department of California Highway Patrol v. Superior Court* (2008) 158 Cal.App.4th 726, 732 [70 Cal.Rptr.3d 280]; *City of Riverside v. Stansbury* (2007) 155 Cal.App.4th 1582, 1587–1588 [66 Cal.Rptr.3d 862].) Moreover a suggestion of mootness is strongly implied by MIC's arguments in its second appeal, *City of Hollister v. Monterey Ins. Co.* (July 29, 2008, H030161) [nonpub. opn.], where it insists that the judgment now before us was not and could not be stayed either by the taking of this appeal or by any subsequent action of the trial court. This appears to

foreshadow a contention on remand that the judgment, even if affirmed, has expired by its terms. To delay consideration of this hypothesis until after a decision on the merits would entail a waste of judicial resources, since if the hypothesis is correct we need not decide the merits at all, and if it is incorrect a delayed determination will only trigger another round of litigation, perhaps followed by yet another appeal. We therefore consider sua sponte whether the appeal is in fact moot.

■ For several reasons, we conclude that it is not. First, if an appeal is technically moot, but "there may be a recurrence of the same controversy between the parties and the parties have fully litigated the issues," a reviewing court may in its discretion reach the merits of the appeal. (*Cucamongans United for Reasonable Expansion v. City of Rancho Cucamonga* (2000) 82 Cal.App.4th 473, 480 [98 Cal.Rptr.2d 202].) Here if we affirmed the judgment on the merits, but MIC successfully argued in the trial court that it had expired by its terms, we see nothing to prevent City from seeking a second declaratory judgment on the premise that MIC's appeal and its continuing intransigence had deprived the City of the fruits of the judgment. Indeed, City would be free on remand to seek a *modification* of the judgment to extend its duration. A court sitting in equity has the inherent power to modify the procedural provisions of its decrees to make them effective. (See, e.g., *Barnes v. Chamberlain* (1983) 147 Cal.App.3d 762, 769 [195 Cal.Rptr. 417] [trial court extended deadline for buyer to deposit purchase money under decree for specific performance of real estate sales contract; reviewing court "confirm[ed] the inherent power of a court of equity to make its judgment effective by additional orders supervising the details of the decreed performance"]; *Palmco Corp. v. Superior Court* (1993) 16 Cal.App.4th 221, 225–226 [19 Cal.Rptr.2d 682] [trial court had inherent power to modify judgment to allow damages incurred due to delay occasioned by defendant's taking of appeal from decree for specific performance; "Any other result would reward Palmco for delaying execution of the judgment and encourage litigants in similar circumstances to present and prolong appeals as long as possible to retain the profits reaped during the delay."].)[20]

■ That the court here was sitting in equity can hardly be questioned. Proceedings for declaratory relief generally sound in equity. (See *Westerholm v. 20th Century Ins. Co.* (1976) 58 Cal.App.3d 628, 632, fn. 1 [130 Cal.Rptr. 164] ["An action for declaratory relief is equitable, and a court of

[20] The judgment was subject to the court's supervisory powers even though it arose from a stipulation. (See *Mendly v. County of Los Angeles* (1994) 23 Cal.App.4th 1193, 1206–1207 [28 Cal.Rptr.2d 822]; *Welsch v. Goswick* (1982) 130 Cal.App.3d 398, 404–405 [181 Cal.Rptr. 703]; *Palo Alto-Menlo Park Yellow Cab Co. v. Santa Clara County Transit Dist.* (1976) 65 Cal.App.3d 121, 130 [135 Cal.Rptr. 192].)

equity will administer complete relief when it assumes jurisdiction of a controversy."].) To the extent that such a proceeding requires the resolution of claims or defenses sounding in law rather than equity, it may be viewed as an action at law for purposes of the right to jury trial. (See *Dills v. Delira Corp.* (1956) 145 Cal.App.2d 124, 129–130 [302 P.2d 397]; *Manneck v. Lawyers Title Ins. Corp.* (1994) 28 Cal.App.4th 1294, 1299–1300 [33 Cal.Rptr.2d 771].) But the central controverted issue here was the applicability of the principles of equitable estoppel, which—as its name suggests—sounds purely in equity. (*Getty v. Getty* (1986) 187 Cal.App.3d 1159, 1176 [232 Cal.Rptr. 603]; *Moss v. Bluemm* (1964) 229 Cal.App.2d 70, 72–73 [40 Cal.Rptr. 50]; *Jaffe v. Albertson Co.* (1966) 243 Cal.App.2d 592, 607–608 [53 Cal.Rptr. 25]; cf. *Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245] ["The existence of an estoppel is generally a question of fact for the trial court whose determination is conclusive on appeal unless the opposite conclusion is the only one that can be reasonably drawn from the evidence."]; *DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd.* (1994) 30 Cal.App.4th 54, 61 [35 Cal.Rptr.2d 515] ["The estoppel issue is a nonjury fact question to be determined by the trial court in accordance with applicable law."].) There was thus no colorable right to a jury trial; the proceeding sounded entirely in equity.

Moreover, the court's decree was quintessentially equitable in that it involved not merely an adjudication of legal rights but a weighing of competing considerations of fairness—the proverbial balancing of equities. The limited duration of the judgment—the very provision that MIC now seeks to exploit—reflects a paradigmatic exercise of the conscience of the chancellor based upon this discretionary balancing process. We have no doubt that the present judgment was rendered in equity, and was therefore subject to the court's inherent supervisory power.

Further proceedings in the trial court to determine the lifespan of the present judgment would in all likelihood produce another appeal. We are loath to dismiss an appeal where the likely result would only be a further expenditure of judicial and litigant resources—including, in this case, taxpayer-funded resources—and further delay in achieving a final resolution of the underlying dispute.

■ The suggestion of mootness fails for a second reason. While MIC is probably correct in contending that the judgment was not automatically stayed by its appeal, it is quite wrong in insisting that the trial court could do nothing to avert the expiration of the judgment by its terms. We agree that the judgment should be viewed as self-executing, such that it was not automatically stayed by the filing of an appeal. (See 9 Witkin, Cal. Procedure, *supra*, Appeal, § 282 et seq.) For these purposes the judgment may be analogized to

an injunction prohibiting MIC from asserting the 180-day provision of the functional replacement endorsement. A prohibitory injunction is not stayed by an appeal. (See *id.*, § 283.) However, it does not follow that the trial court lacked any power to stay the effect of its own judgment. MIC conspicuously omits any acknowledgment of the trial court's statutory power to "stay enforcement of any judgment or order." (Code Civ. Proc., § 918, subd. (a).) This power is expressly granted "whether or not a notice of appeal has been filed." (*Id.*, subd. (c).) Insofar as the judgment contemplated "enforcement," the trial court had the express power to stay it.

Moreover, the court had the power to *modify* the order, at least so long as the modification did not threaten the subject matter of the appeal. Again, the nearest analogy is a prohibitory injunction. Where an injunction of limited duration is appealed, the trial court has power to extend the injunction pending disposition of the appeal if doing so would serve the ends of justice. (See *Green Trees Enterprises, Inc. v. Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 789 [59 Cal.Rptr. 141, 427 P.2d 805]; *Planned Parenthood Assn. v. Operation Rescue* (1996) 50 Cal.App.4th 290, 303, fn. 8 [57 Cal.Rptr.2d 736].) Here there is little doubt that this condition was met. The effect of the stay order—at least its intended effect—was to preserve the subject matter of the litigation until the issues kept alive by MIC's appeal could be resolved. The order thus served the same purpose as the automatic stay, which is to preserve the parties' positions pending the outcome of the appeal. (See *State I. & I. Co. v. San Francisco* (1894) 101 Cal. 135, 150 [35 P. 549] ["The effect of an appeal from a judgment when the proceedings thereon are stayed, is to preserve the rights of the parties to the controversy in the same condition as they were prior to the entry of the judgment."]; *Dewey v. Supreme Court* (1889) 81 Cal. 64, 68 [22 P. 333] ["During the pendency of the appeal, the court below could do no act which did not look to the holding of the subject of the litigation just as it existed when the decree was rendered."]; *Paramount Pictures Corp. v. Davis* (1964) 228 Cal.App.2d 827, 835 [39 Cal.Rptr. 791], quoting *Dewey v. Supreme Court, supra,* 81 Cal. at p. 68 ["It is well settled that an injunction mandatory in character is automatically stayed on appeal and that a prohibitory injunction is not so stayed [citations], 'the object of the rule in both cases being to preserve the *status quo.* Otherwise the result of the final adjudication might often be a barren victory.' "].)

MIC contends that to extend the effect of the amended judgment would "punish" or "penaliz[e]" it for filing this appeal by "rewrit[ing]" the judgment "more favorably" to City. We reject this characterization. Were MIC to prevail on the merits of the appeal, the ensuing reversal of the judgment would give it everything it is entitled to. The purpose of the trial court's stay order was to preserve City's substantive rights, as found and declared in the judgment, in the event the judgment is *affirmed.* This does not penalize MIC

for bringing an appeal; it prevents MIC from gaining an *unjustified advantage* merely by bringing a meritless appeal.

Even assuming the trial court lacked the power to modify the amended judgment while this appeal is pending, it would be highly injudicious to dispose of this appeal on such a ground where the almost certain result would merely be to guarantee further litigation below, probably followed by another appeal raising the very issues that are now before us. A dismissal would therefore accomplish nothing but delay and waste. To avoid this, we need only exercise our own power to modify the judgment to express the trial court's plain intention. (See Code Civ. Proc., §§ 43, 187.) We will therefore modify the amended judgment of August 9, 2005, to state that MIC is estopped from asserting the 180-day contracting condition as a ground for denying functional replacement coverage unless City fails to enter into a contract within 180 days after the judgment becomes final in the sense that it is immune from further direct appellate review. So modified, the judgment presents a live controversy which we will address on the merits.

## II.   *Standard of Review*

MIC contends that the trial court erred in ruling that, as a result of MIC's conduct, it is estopped to raise the 180-day contracting clause as a defense to a claim for functional replacement value coverage. This challenge implicitly presents two major questions. The first is whether the facts *as expressly or impliedly found* by the trial court furnished a *legally sufficient* basis for an estoppel. This in turn involves two subsidiary inquiries: One accepts the court's findings as sound and asks whether they are *legally sufficient* to sustain its ruling, i.e., whether an estoppel *can* lawfully arise from the facts found by the trial court. This is a question of law subject to independent appellate review. (See *Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 408 [58 Cal.Rptr.3d 527].) The second subsidiary inquiry assumes that an estoppel *may* be imposed on the facts found, but asks whether it *should* be imposed in view of competing considerations of fairness and policy. This question is entrusted to the trial court's discretion, and that court's resolution must be viewed deferentially on appeal. (See *Phillippe v. Shapell Industries* (1987) 43 Cal.3d 1247, 1272 [241 Cal.Rptr. 22, 743 P.2d 1279] (dis. opn. of Kaufman, J.) ["the trier of fact exercises considerable discretion in determining whether to enforce the statute of frauds or to estop its effect in the interests of justice"]; *Rouse v. Underwood* (1966) 242 Cal.App.2d 316, 328 [51 Cal.Rptr. 437] ["[T]he trial court has the power to deny relief, on its own motion, where laches or estoppel is disclosed by the evidence; and whether such a situation exists is a question in the first instance for the trial court's determination."].) The trial court's ruling on this point will not be disturbed unless it constitutes an abuse of discretion, i.e., " 'the contrary conclusion is

the only one that can reasonably be drawn from the evidence.' " (*Phillippe v. Shapell Industries, supra*, 43 Cal.3d at p. 1272 (dis. opn. of Kaufman, J.), quoting *Mehl v. People ex rel. Dept. Pub. Wks.* (1975) 13 Cal.3d 710, 715–716 [119 Cal.Rptr. 625, 532 P.2d 489]; see *Rouse v. Underwood, supra*, 242 Cal.App.2d at p. 323 ["[T]he existence of laches is to be determined by the chancellor, and an appellate tribunal ordinarily will not interfere with the discretion of the trial judge unless there is a manifest injustice, or unless the conclusion reached in the court below does not find substantial support in the evidence."]; cf. *Doe v. Bakersfield City School Dist.* (2006) 136 Cal.App.4th 556, 571 [39 Cal.Rptr.3d 79] [denial of relief from claims statute reversed where plaintiff "presented undisputed evidence of circumstances giving rise to estoppel" that extended beyond dates when trial court concluded cause for estoppel had ceased].)

The second major question implicated by MIC's arguments is whether the *evidence* before the trial court was *sufficient to establish the facts* found by that court. On this point the governing standard of review has been settled for decades if not centuries, and yet a staggering proportion of appellate advocates continue to overlook, misunderstand, or ignore it. We recently summarized the relevant principles in *Huong Que, Inc. v. Luu, supra*, 150 Cal.App.4th at page 409: "An appellate court ' "must *presume* that the record contains evidence to support every finding of fact . . . ." ' (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887 [160 Cal.Rptr. 516, 603 P.2d 881], italics added; see *Brown v. World Church* (1969) 272 Cal.App.2d 684, 690 [77 Cal.Rptr. 669] [' "a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact" '].) It is the appellant's burden, not the court's, to identify and establish deficiencies in the evidence. (*Brown v. World Church, supra*, 272 Cal.App.2d 684, 690.) This burden is a 'daunting' one. (*In re Marriage of Higinbotham* (1988) 203 Cal.App.3d 322, 328–329 [249 Cal.Rptr. 798].) 'A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable*, and show *how and why it is insufficient*. [Citation.]' (*Roemer v. Pappas* (1988) 203 Cal.App.3d 201, 208 [249 Cal.Rptr. 743], italics added.) '[W]hen an appellant urges the insufficiency of the evidence to support the findings it is his duty to set forth a fair and adequate statement of the evidence which is claimed to be insufficient. He cannot shift this burden onto respondent, nor is a reviewing court required to undertake an independent examination of the record when appellant has shirked his responsibility in this respect.' (*Hickson v. Thielman* (1956) 147 Cal.App.2d 11, 14–15 [304 P.2d 122].)"

MIC betrays its misapprehension of these principles by offering, without the supporting demonstration required by these authorities, such assertions as that the trial court's "analysis" is "not supported by the facts," that its findings are "misstatements of the evidence," and that they are "erroneous."

Later it states that the court "was wrong in finding the elements of estoppel" and that "[u]nder the facts at hand, there is no basis in law" for the court's ruling. It also refers to the court's supposed misconstruction of what certain letters "really said." All of these assertions evade the threshold question, which is whether the findings necessary to sustain the judgment were supported by substantial evidence. In a few cases MIC characterizes a finding—express, implied, or argumentatively attributed to the trial court—as "not supported by the evidence" or "not supported by any evidence." This at least acknowledges that the question is not what MIC or this court supposes the facts to be but what the trial court could *reasonably find* them to be on the evidence before it. Even these assertions are unavailing, however, for MIC's accounts of the evidence before the trial court are far too one-sided to trigger any duty on our part to consider its sufficiency.

Occasionally MIC simply contradicts the trial court's finding, as though this court were free to interpret the evidence as it sees fit. Thus MIC asserts that Boczar told Jackson and Lee "that he would 'resist' (not 'fight') a functional replacement claim." The trial court expressly found that Boczar "told Messrs. Lee and Jackson that he would fight any claim for Functional Replacement." That finding is beyond appellate peradventure given Lee's plain and repeated testimony that Boczar's words were "I will fight that one." In support of its contrary assertion MIC cites only a memorandum by Boczar in which he wrote, "I informed them that in my opinion any claim presented for functional replacement on a building that was being considered for demolition . . . would not be appropriate and that I would resist same." This paraphrase does not contradict Lee's direct quote, and if it did we would be powerless to credit it in derogation of the trial court's finding.

Yet another permutation of MIC's misapprehension of the standard of review is its recurring suggestion that the record is factually *uncertain* with respect to various events and circumstances. Thus it writes, "It is not known whether the city decided it [entering a contract] could not be done and gave up at the outset, attempted one (or more) . . . plans [to enter a contract] and failed, or simply stalled, hoping to get an extension of several years before having to replace the building, in view of the city's building moratorium." But these matters are *not* "unknown" for purposes of this appeal. Some of them are governed by explicit trial court findings, e.g., that City was willing and able to enter into a contract but was prevented from doing so by MIC's conduct. Insofar as the record is silent, the trial court is *presumed* to have answered these questions in a manner supporting the judgment, i.e., adversely to MIC. And those answers, express or implied, are *binding* on the parties, and on us, unless MIC affirmatively demonstrates that they are not supported by substantial evidence. MIC has not attempted the required demonstration. Accordingly, all these "unknown" questions must be answered in a manner that will support the judgment. Indeed, since no competent challenge to the

sufficiency of the evidence is made, all of the trial court's findings, express and implied, must be deemed *conclusively true* for purposes of this appeal.

III. *Equitable Estoppel*

A. *In General*

The trial court's analysis of the case rested largely on its determination that, because of MIC's conduct in handling City's claim for functional replacement benefits, MIC was estopped to assert the 180-day contracting condition as a bar to such benefits. Much of MIC's challenge to this ruling rests on suppositions about the elements that will support the imposition of an estoppel.

■ Broadly speaking, "estoppel" refers less to a doctrine than to a conceptual pattern, first articulated in the courts of equity, which has come to pervade our law. When it is successfully invoked, the court in effect closes its ears to a point—a fact, argument, claim, or defense—on the ground that to permit its assertion would be intolerably unfair.[21] It is commonly said that the party to be estopped, having conducted himself in manner X, will "not be heard" to assert Y. (See *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 411 [87 Cal.Rptr.2d 453, 981 P.2d 79] (dis. opn. of Kennard, J.), quoting *Cushman v. Cushman* (1960) 178 Cal.App.2d 492, 498 [3 Cal.Rptr. 24] [" 'one will not be heard to urge error which he is estopped to raise . . .' "]; *In re Carson Bulletin* (1978) 85 Cal.App.3d 785, 792 [149 Cal.Rptr. 764] ["As a general rule, 'one who voluntarily proceeds under a statute and claims benefits thereby conferred will not be heard to question its constitutionality in order to avoid its burdens.' "].)

■ A paradigmatic estoppel arises from prior conduct by the asserting party that is somehow at odds with a point now sought to be asserted in

---

[21] Sometimes an estoppel is said to arise from a blame-free circumstance, such as a party's status. (See, e.g., 12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 607 [tenant estopped to contest landlord's title]; Evid. Code, § 624 [same].) When this occurs it is not a case of equitable estoppel, but the application of a categorical rule of law comparable to the statute of frauds or the parol evidence rule, either of which might be expressed in the language of estoppel, though both operate categorically and involve no element of blame. Indeed, "estoppel" has been appropriated as a label for doctrines having no relation to the core equitable conception. The best known of these is "collateral estoppel," under which a party may be barred from relitigating an issue he has already litigated. (*Ferraro v. Camarlinghi* (2008) 161 Cal.App.4th 509, 540–541 & 541, fn. 21 [75 Cal.Rptr.3d 19].) This doctrine has little to do with any particularized conception of fairness or with the exercise of judicial conscience that is characteristic of equity. Instead the term has been appropriated in these instances as a synonym for "preclusion." In the case of collateral estoppel, modern authorities favor the term "issue preclusion." (See *ibid.*)

litigation. Typically the triggering conduct is itself in some manner blame-worthy. (See *Getty v. Getty, supra*, 187 Cal.App.3d 1159, 1185, quoting *Gamboa v. Atchison, Topeka & Santa Fe Ry. Co.* (1971) 20 Cal.App.3d 61, 65 [97 Cal.Rptr. 471] ["Estoppel applies only if there is 'some element of fraud or blame on the party against whom the estoppel is asserted.' "].) Even if innocent in its own right, the conduct must usually operate to cast a pall of unfairness over the position now asserted. This requires that the predicate conduct somehow caused the party asserting the estoppel to suffer some harm or change of position without which the matter now asserted could or would have been deprived of its damaging potential. Basically, the party to be estopped induced the party asserting estoppel to conduct himself in a manner that unfairly exposes him to the argument, claim, or defense against which the estoppel is sought.

The paradigmatic equitable estoppel arises where a prospective defendant induces a prospective plaintiff not to protect his rights, and when the plaintiff attempts to assert them, raises a defense that exploits the plaintiff's lapse. The classic example is the assertion of a procedural bar, such as a statute of limitations, after the defendant has induced the plaintiff not to file suit within the allotted time. If the court is satisfied that the facts and the equities justify application of the doctrine, it will hold the defendant estopped to assert the defense, and the matter will proceed as if the claim had been seasonably asserted.

Estoppel effects a forfeiture, i.e., the loss of an otherwise viable right. It is akin to the doctrine of waiver, often invoked in the same breath, and sometimes confused with it. The essence of waiver, however, is the voluntary relinquishment of a known right, which may be effective as a matter of law without any demonstration that the other party was caused by the waiver to expose himself to any harm. Such causation is essential to estoppel, and where it is present the estoppel may arise involuntarily, and may effect the loss of rights the actor did not know he possessed. (See *Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.* (2006) 144 Cal.App.4th 1175, 1189–1190 [51 Cal.Rptr.3d 144]; *DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd., supra*, 30 Cal.App.4th 54, 59.)

A widely cited formula describes the elements of estoppel as follows: " '1. There must have been a false representation or a concealment of material facts; 2. The representation must have been made with knowledge, actual or virtual, of the facts; 3. The party to whom it was made must have been ignorant, actually and permissibly, of the truth of the matter; 4. It must have been made with the intention, actual or virtual, that the other party should act upon it; 5. The other party must have been induced to act upon it.' " (*Wood v. Blaney* (1895) 107 Cal. 291, 295 [40 P. 428], quoting Bigelow,

Estoppel (4th ed.) p. 552; see Bigelow, Estoppel (5th ed. 1893) p. 570.) This formula, however, would limit equitable estoppel to situations amounting to fraud. As appears in the following discussion, the concept has not been so narrowly applied. A more accurate description of the elements of equitable estoppel would appear to be: (1) The party to be estopped has engaged in blameworthy or inequitable conduct; (2) that conduct caused or induced the other party to suffer some disadvantage; and (3) equitable considerations warrant the conclusion that the first party should not be permitted to exploit the disadvantage he has thus inflicted upon the second party.

## B. *Estoppel in the Insurance Setting*

■ In the insurance context especially, estoppel may arise from a variety of circumstances in which the insurer's conduct threatens to unfairly impose a forfeiture of benefits upon the insured. Indeed, California courts have long held that "equitable relief" may be broadly available in a proper case to relieve an insured of a forfeiture under a contractual condition of coverage. (*O'Morrow v. Borad* (1946) 27 Cal.2d 794, 800 [167 P.2d 483]; *Root v. American Equity Specialty Ins. Co.* (2005) 130 Cal.App.4th 926, 929 [30 Cal.Rptr.3d 631].) Thus an insurer may be estopped to assert a contractual limitations period if its conduct " 'induces the belated filing of the action.' " (*Prudential-LMI Com. Insurance v. Superior Court* (1990) 51 Cal.3d 674, 689–690 [274 Cal.Rptr. 387, 798 P.2d 1230] (*Prudential*); see *Spray, Gould & Bowers v. Associated Internat. Ins. Co.* (1999) 71 Cal.App.4th 1260, 1267–1268 [84 Cal.Rptr.2d 552] (*Spray*).) Such a result does not require affirmative conduct or fraudulent intent by the insurer; rather it is predicated on the insurer's failure to speak when in law or equity it is bound to so—as where it delays formal denial of a claim to complete its own investigation (see *Prudential, supra*, 51 Cal.3d at p. 688, discussing *Peloso v. Hartford Fire Insurance Co.* (1970) 56 N.J. 514 [267 A.2d 498, 501]), conceals " 'the identity of the wrongdoer' " (*Prudential, supra*, at p. 690, quoting 3 Witkin, Cal. Procedure (3d ed. 1985), Actions, § 523, p. 550; see now 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 685, p. 873), or fails to comply with a regulatory requirement that it notify the insured of the limitations period (*Spray, supra*, 71 Cal.App.4th at p. 1268).

■ In *Spray, supra*, 71 Cal.App.4th at pages 1264–1265, the insurer was alleged to have violated a regulatory requirement that it notify the insured of "all benefits, coverage, time limits or other provisions of [the] insurance policy." (Cal. Code Regs., tit. 10, § 2695.4, subd. (a).) The court held that while violations of the fair claims practices regulations do not give rise to a private right of action (see *Spray, supra*, 71 Cal.App.4th at p. 1271, citing *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287 [250 Cal.Rptr. 116, 758 P.2d 58], and *Zephyr Park v. Superior Court* (1989) 213

Cal.App.3d 833, 836–838 [262 Cal.Rptr. 106]), they may constitute the kind of inequitable conduct that will justify an estoppel to assert a procedural forfeiture under an insurance policy.

The same regulation cited in *Spray* goes on to provide as follows: "When additional benefits might reasonably be payable under an insured's policy upon receipt of additional proofs of claim, the insurer shall immediately communicate this fact to the insured *and cooperate with and assist the insured in determining the extent of the insurer's additional liability.*" (Cal. Code Regs., tit. 10, § 2695.4, subd. (a), italics added.) Another regulation provides, "Every insurer shall conduct and diligently pursue a thorough, fair and objective investigation and shall not persist in seeking information not reasonably required for or material to the resolution of a claim dispute." (*Id.*, § 2695.7, subd. (d).)

The regulations also place specific time constraints on an insurer to whom a claim has been presented. They require that within 15 days after receiving notice of a claim, the insurer "provide to the claimant necessary forms, *instructions*, and *reasonable assistance*, including but not limited to, *specifying the information the claimant must provide for proof of claim.*" (Cal. Code Regs., tit. 10, § 2695.5, subd. (e)(2), italics added; see *id.*, § 2695.5, subd. (b) [insurer must respond to any communication from claimant within 15 calendar days].) The regulations require the insurer to accept or deny any claim "immediately" upon receiving proof of the claim, "but in no event more than forty (40) calendar days later . . . ." (*Id.*, § 2695.7, subd. (b).) If the insurer requires more time than this, it is required to give notice of that fact to the insured, "*specify*[ing] *any additional information the insurer requires* in order to make a determination and stat[ing] any continuing reasons for the insurer's inability to make a determination. Thereafter, the written notice shall be provided every thirty (30) calendar days until a determination is made or notice of legal action is served. If the determination cannot be made until some future event occurs, then the insurer shall comply with this continuing notice requirement by advising the claimant of the situation and providing an estimate as to when the determination can be made." (*Id.*, § 2695.7, subd. (c)(1).)

■ Although no decision has held that violations of these requirements may sustain the imposition of an estoppel to assert a procedural condition of coverage, we see no reason to exempt them from the logic of *Spray*. Application of these regulations in this manner causes no enlargement of an insurer's substantive liabilities, which was a central reason for abrogating the imposition of civil liability for unfair claims practices, particularly since that liability could far exceed anything the insurer had ever agreed to pay under its policy. (See *Moradi-Shalal v. Fireman's Fund Ins. Companies, supra*, 46

Cal.3d at p. 301 ["Other commentators agree that . . . [the] allowance of a direct action against the insurer, may result in escalating insurance costs to the general public resulting from insurers' increased expenditures to fund coerced settlements, excessive jury awards and increased attorney fees."].) At worst imposing an estoppel against a procedural defense obligates the insurer to pay what it has agreed to pay when its only defense to payment is brought into being by its own inequitable conduct. The alternative would be that the insurer profits from its own wrong in bringing about the conditions for the insured's loss of coverage. As a risk-spreading mechanism, insurance should carry the true cost of the risk shared—not a cost discounted to reflect some number of unfortunate claimants who can be induced by the insurer to forfeit their benefits. We thus detect neither injustice nor any offense to public policy in holding an insurer subject to estoppel based on its violation of claims practices regulations. Such a result merely means that it is equitably prevented from exploiting procedural violations that are a product of its own failures to comply with governing law.

■ Quite apart from regulations, an insurer bears a common law obligation to assist the insured to recover bargained-for policy benefits. The 180-day contracting requirement here was unquestionably a condition precedent to City's right to functional replacement benefits. (See 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 776, p. 866 ["A condition is a fact, the happening or nonhappening of which creates (condition precedent) or extinguishes (condition subsequent) a duty on the part of the promisor." (Italics omitted.)]; Civ. Code, § 1436 ["A condition precedent is one which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed."].) It is hornbook law that where one contracting party prevents the other's performance of a condition precedent, the party burdened by the condition is excused from performing it, and the benefited party's duty of performance becomes unconditional. (1 Witkin, *supra*, Contracts, § 821, pp. 910–911; 14A Cal.Jur.3d (2008) Contracts, § 357, pp. 279–280; *Houghton v. Steele* (1881) 58 Cal. 421, 424; see Civ. Code, § 1511, subd. 1 [want of performance of contractual obligation is excused when it is "prevented or delayed by the act of the creditor"]; *id.*, § 1512 ["If the performance of an obligation be prevented by the creditor, the debtor is entitled to all the benefits which he would have obtained if it had been performed by both parties."].) But the law does not merely prohibit a contracting party from *actively interfering* with the other's performance of a condition; it may also impose a duty to *affirmatively cooperate* in that performance. If one party's cooperation is "necessary for successful performance" by the other, the contract will generally be held to include an implied obligation to "give that cooperation," as well as to refrain from doing "anything that prevents realization of the fruits of performance . . . ." (1 Witkin, *supra*, Contracts, § 798, p. 892.)

This obligation is often described as a manifestation of the duty of good faith and fair dealing, which arises from every contract as an implied covenant generating both a contractual obligation and a duty in tort. (*Davis v. Blue Cross of Northern California* (1979) 25 Cal.3d 418, 428 [158 Cal.Rptr. 828, 600 P.2d 1060]; see *Pasadena Live v. City of Pasadena* (2004) 114 Cal.App.4th 1089, 1093 [8 Cal.Rptr.3d 233], quoting *Harm v. Frasher* (1960) 181 Cal.App.2d 405, 417 [5 Cal.Rptr. 367] [" 'This covenant . . . not only imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose.' "]; see *Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1147–1148 [271 Cal.Rptr. 246].) In the insurance context, this principle is reflected in the imposition on the insurer of an obligation to provide information necessary to protect the insured's right to bargained-for benefits under the policy. (See, e.g., *Walker v. Occidental Life Ins. Co.* (1967) 67 Cal.2d 518, 522–524 [63 Cal.Rptr. 45, 432 P.2d 741].) Thus in *Davis v. Blue Cross of Northern California, supra*, 25 Cal.3d at page 428, the court wrote that an insurer is under a "duty reasonably to inform an insured of the insured's rights and obligations under the insurance policy. In particular, in situations in which an insured's lack of knowledge may potentially result in a loss of benefits or a forfeiture of rights, an insurer has been required to bring to the insured's attention relevant information so as to enable the insured to take action to secure rights afforded by the policy."

## IV. *Application*

### A. *Conduct*

The trial court properly found that MIC's conduct furnished an adequate predicate for an equitable estoppel to assert the 180-day limitations period in the functional replacement endorsement. MIC patently failed to "cooperate with and assist the insured in determining the extent of the insurer's additional liability." (Cal. Code Regs., tit. 10, § 2695.4, subd. (a); see *Davis v. Blue Cross of Northern California, supra*, 25 Cal.3d at pp. 427–428.) Indeed, the trial court could quite properly find that MIC actively interfered with City's performance of the 180-day contracting condition, intentionally and in bad faith, by obstructing, delaying, and interfering with City's efforts to determine its rights under the policy.

First and most obviously, throughout the time City was supposed to be arranging a contract to replace Building 25, MIC threatened to deny reimbursement for such a project, while refusing to take any definite position on coverage until *after* City had bound itself by contract to pay for a replacement building. The trial court was entitled to find that the potential grounds

for denial hinted at by MIC were either meritless or nebulous to the point of invisibility. The foremost of these phantom obstacles concerned City's supposed preexisting intention to demolish Building 25. MIC repeatedly suggested that such an intention would bar a claim for functional replacement coverage, but no legal basis for this position has ever been offered. Obviously, if City *had* demolished the building, it would thereby have destroyed the subject matter of the policy and precluded any later-arising claim for damage to it. It would not follow that MIC, having collected a premium to insure the building against fire, could be excused from honoring that obligation merely because, had the fire not occurred, the building would eventually have been torn down. The time to concern itself with future plans for the building was in March 2002, when City plainly communicated that Building 25 was among a group of airport buildings that might eventually be demolished. Instead of withdrawing coverage or seeking clarification at that time, MIC renewed the policy, including functional replacement coverage in an increased amount. MIC has never suggested any legal basis on which it might avoid the obligation it thus voluntarily assumed for valuable consideration with its eyes wide open.

Nor was there any substantial *factual* basis for the demolition defense. At most the evidence suggested that city officials had discussed the eventual demolition of some airport buildings, and that the rumor mill had magnified and distorted these discussions into a common report that Building 25 was doomed. Although any formal consideration or action in this regard would presumably be reflected in public documents, MIC made no attempt to substantiate the rumors. Indeed there is no evidence that MIC conducted any investigation on the subject beyond demanding that City produce documents that City officials said did not exist, and whose existence MIC made no effort to establish.

From this very lack of investigation the trial court could reasonably infer that MIC did not wish to discover the true facts but preferred to assert the nebulous *possibility* of a demolition defense as a pretext for refusing to concede the viability of a claim for functional replacement coverage. That refusal would go far, if it was not sufficient by itself, to stymie any attempt by City to satisfy the contracting condition. At the same time, it permitted MIC to distract attention from what Hagerty recognized as the real bone of contention, which was the actual cost to construct a functionally equivalent replacement building.

The trial court could find that responsible actors at MIC were well aware of the unsoundness of the demolition defense. Hagerty professed to have instructed Boczar, two months after the fire, to abandon that defense unless the demolition of Building 25 were shown to have been "actually on a

calendar." There was never any suggestion, even by the legion of rumormongers to whom Boczar professed to have spoken at the airport, that the building had ever been "on a calendar for demolition." The trial court was therefore free to view Hagerty's testimony as an admission that as of January 28, 2003, MIC knew the demolition defense could not be substantiated. Indeed, Boczar testified that Hagerty instructed him to "refrain from resisting a claim for functional replacement cost at that point." The trial court was entitled to disbelieve this testimony, as well as Hagerty's claimed instruction to Boczar, because two days later they wrote to City that "questions" still under investigation included "the viability of claims for fire loss to a building that was *being vacated for planned demolition* before the fire . . . ." The court was entitled to find that this statement was not only incompatible with Hagerty's supposed instruction to Boczar, but was also false in its own right.[22] Such inferences need not have blinded the court, however, to the inherent admission that there was no viable demolition defense.

The trial court could find that MIC made other obstructive assertions for which no basis in fact or rumor existed, perhaps most notably the statement to the assistant for City's broker that at the time of the fire, "quotes [were] being obtained for [Building 25's] demolition."[23] The court could also find that MIC did not speak truthfully when it wrote that it was "continuing its investigation," was "investigating the cause and origin of th[e] fire," and would "share the results of that investigation" with City "once it [wa]s completed." Other statements, if not flatly false, only avoided that characterization by using ambiguous language. Thus Hagerty-qua-Boczar wrote on January 30 that "Monterey Insurance Company was informed by Mr. Lee in writing on March 7, 2002[,] regarding the City's plans to demolish the building involved in the fire." Lee wrote nothing about any "plans" to demolish Building 25. In his March 2002 notation on MIC's underwriting recommendation, he wrote most pertinently, "It is undetermined at this time whether or not the aforementioned facilities will be demolished or not." He added that a decision was anticipated by spring, and that the buildings would be painted if they were to remain in use. Spring came and went without any

---

[22] On his visit to the scene Boczar talked to one tenant who happened to be there retrieving his belongings, and who told him that *he* was being evicted. There is no basis for MIC's apparent connection of this report with the demolition rumors, and on January 27, Lee and Jackson told Boczar as much, explaining that the tenant was being evicted for nonpayment of rent. Nor is there evidence of any attempt by City—even a rumored one—to "vacate[]" the building as a whole.

[23] The only apparent basis for this assertion was Boczar's reported conversation with a would-be demolition contractor who said that "he wanted to present the winning bid to demolish the building" after it burned, "and he had been working on a presentation like that prior to the loss." Through the miracle of self-serving distortion, apparently, the contractor's *intended* "presentation" *to* city officials evolved into City's actively obtaining "quotes" for demolition.

painting and without any decision on the long-term fate of the buildings, but MIC nonetheless renewed the policy.

The court was entitled to conclude that once MIC told city officials it would "fight" a claim for functional replacement value, it assumed an affirmative duty—if it was not already under one—to plainly inform City of its supposed decision *not* to fight such a claim. This is something MIC apparently had not done as of the commencement of trial. It eventually stopped alluding to the demolition defense—at least it did not assert any such defense at trial—but there is no evidence that it ever informed City, directly or indirectly, that it was abandoning the defense. Its failure to do so was by itself enough to sustain an estoppel.

The court could also find that MIC was not dealing fairly when it adopted the position that all impediments to the resolution of a functional replacement claim were attributable to City's supposed failure to perfect such a claim. On one level MIC apparently meant that City had not yet presented a signed contract as required by the contracting condition. But even this dubious proposition was not clearly conveyed. Instead City was battered with a barrage of nebulous criticisms and vague threats that the trial court was entitled to view as part of a concerted campaign of intimidation. Thus on January 30, Hagerty wrote, through Boczar, "No decision as to the settlement of this claim will be made until a formal claim is presented to the Monterey Insurance Company by the insured." In its next communiqué three months later, again sent over the false flag of Boczar's signature, MIC wrote, "The City of Hollister has yet to present its claim as requested, and as required by the policy. The adjustment process will not be completed until the City of Hollister determines what claim it wishes to present and provides the necessary information required for us to evaluate that claim." The letter attempts to cast the blame for delays on undefined failures by City to cooperate: "The City . . . needs to communicate whether it intends to replace the building, the amount of its claim, and the documents used to support the amount claimed." "The City . . . has not complied with the policy requirements concerning the presentation of its actual claim." "I have done nothing to stop the City . . . from contracting to replace the building. If it wishes to do so, it can. Please provide me with a copy of the contract and any estimate or bid upon which such contract is based. In addition, *please provide the other information*, which has been requested and is required by the policy."[24]

---

[24] Among these nebulous protestations is an important admission by MIC: "The City . . . can do whatever it wants concerning the replacement of the building, subject to the requirement that the building be restored or replaced for the same occupancy and use. *The policy sets forth theoretical amounts that might be owed should the City elect to replace the building . . . .* It is for the City . . . to decide whether to repair or replace the building, and how much to spend to do the work. *The policy merely describes how the amount owed might be measured*

The obstructive purpose of this letter is most evident in its references to "information . . . required for the City of Hollister to present its claim" and "the other information, which has been requested and is required by the policy." MIC has never identified any pertinent information that City had not turned over months earlier. Yet MIC now seemed to hint for the first time that City had failed to comply with the "Loss Conditions" of the policy, under which a claimant must honor the insurer's requests for information, must permit inspection of the property, and must "[c]ooperate . . . in the investigation or settlement of the claim." If MIC were speaking in good faith, one might expect this allusion to City's duty of cooperation to be followed by a specification of the particulars in which City's cooperation was wanting. Instead it was followed by the nebulous assertion that "The City of Hollister has yet to present its claim as requested, and as required by the policy. The adjustment process will not be completed until the City of Hollister determines what claim it wishes to present and provides the necessary information required for us to evaluate that claim."

The trial court was entitled to find that these repeated references to missing information were a smokescreen for MIC's own recalcitrance and delay. The closest thing in the April 30 letter to an identified failing by City was the notion that it had not communicated to MIC an unequivocal election to pursue a functional replacement claim. This was a red herring. The policy did not require an advance election, but entitled City to market value unless and until it signed a replacement contract, whereupon it became entitled to reimbursement under the standards expressed in the endorsement. Under the authorities and principles we have described, MIC was obligated to assist City in fulfilling the latter condition, including the decision whether it was worthwhile to do so. Further, City had long since communicated its desire to recover functional replacement benefits, and MIC was fully aware of that desire. Lee testified that when the subject of functional replacement came up on January 27, "we indicated as I stated several times that we wanted to go in that direction." Two days later City's broker wrote to MIC stating that City's functional replacement coverage was "where the insurance needs to start kicking in. This is where [MIC] needs to begin this claim and *do everything possible to replace this building* per the policy limits and coverages." (Italics

---

*and calculated.*" (Italics added.) The admission that there was a "theoretical" amount due under the policy goes far to dispel any excuse for MIC's failure to ascertain that amount and inform City of it. MIC was understandably reluctant to do so, if only because the policy required reimbursement for the *lesser* of the "theoretical" amount and the amount *actually spent* on reconstruction or repair. By concealing the "theoretical" figure, MIC could hope that fiscal caution would cause the City—if it dared to enter a contract at all—to do so on the cheap, thereby saving MIC from paying everything to which City might otherwise be entitled. But the policy nowhere authorized MIC to withhold this information. The regulations, case law, and principles we have already described required MIC to disclose it, at least if it hoped to trigger the contracting condition.

added.) She went on to write that as a result of the January 27 meeting with Boczar, city officials were so "greatly worried and concerned about the 180-day clause"—that is, about City's ability to successfully recover functional replacement value—"that they are now bringing in their city attorney." On February 10, attorney Hurley wrote that City "would like to contract to replace its building" and followed this with three paragraphs concerning uncertainties that MIC needed to address before City could do so. Indeed Hagerty himself testified that as of January 28, "the city was telling us of its intention to present that claim." None of this evidence can be reconciled with MIC's professions of ignorance as of April 30, 2003, concerning City's intentions and desires.[25]

The trial court was entitled to find that the April 30 letter was intended to mystify and confound City by implying a universe of undisclosed information and unperformed duties when in fact there were no outstanding requests for information, no constraints on MIC's ability to inspect the premises or otherwise conduct any investigation it chose, and no failure by City to cooperate.

Even as MIC was throwing up phantom doubts about *coverage*, it was withholding information on the real issues that would "enable [City] to take action to secure rights afforded by the policy." (*Davis v. Blue Cross of Northern California, supra,* 25 Cal.3d at p. 428.) One such item of information was MIC's own determination that the building was a total loss subject to functional replacement, and not something less than a total loss that was subject only to repair. Boczar testified that he had "[t]old Mr. Lawrence Jackson the day I met him it was a total loss." The trial court was entitled to doubt the accuracy of this testimony, which was inconsistent with Boczar's manifest reluctance to concede any other point bearing on MIC's liability under the policy. Further, the court could reasonably infer that Jackson would have shared any such concession with responsible city officials, yet City Attorney Cass testified that for at least two months after the fire, city officials did not know whether the object of the contract was to be the replacement of the building or only its repair—a question that turned on whether it was a total loss. Moreover, in its January 8 letter—several weeks after Boczar's supposed concession to Jackson—MIC referred to City's "claim . . . for *damage* to the warehouse [*sic*] building at the Hollister Airport" and described Building 25 as "[t]he *damaged* building." Boczar was asked at trial why this characterization, which implies that the building might be repairable, was used. He did not claim that the characterization was inadvertent or ill

---

[25] Perhaps the most bizarre statement in the April 30 letter is the assertion that, having formed the impression in late January that he was to meet again with Jackson and Lee in two weeks, Boczar "heard nothing further from [them]." In fact, as discussed in more detail below, Boczar had rendered himself incommunicado.

considered. Instead he affirmed the opposite by answering, "[B]ecause the investigation wasn't complete. The investigation of the claim wasn't complete." This implies that MIC had not made up its mind about the reparability of the building. But Boczar went on immediately to testify, "[A] determination was made *the first day* that the building was a total loss if that's what you are asking me." (Italics added.) Beyond a claimed but undocumented oral statement to Jackson, MIC did not communicate this determination to City; instead it continued to imply the opposite until some five months after it made the determination and 79 days after Hurley formally inquired on the subject.

City and its representatives also labored under a misapprehension, which MIC did not dispel for this same period, about the applicable policy limits. On December 11, 2002, Deanna Darling faxed MIC expressing concern over its intended disposition of City's claim and stating, among other things, that the applicable coverage was $1,052,480. She reiterated this view in her fax of January 29, 2003, writing that "the insured has a policy written with a limit of $1,052,480 . . . ." This belief was obviously communicated to Attorney Hurley, who wrote on February 10 that MIC "insured the building . . . for over one million dollars." That supposition in turn led him to assert that "the cost to replace the building with a less costly building that is functionally equivalent will . . . exceed the limits of the policy" and that MIC was therefore obligated to "confirm that it will pay the limits of the policy, or tell the City what estimate you have received for replacing the building." MIC did nothing to correct any of these statements until April 30, when it wrote, "The building was insured on a blanket basis, with several other buildings . . . under the functional replacement-cost basis with a policy limit of $7,258,900.00."

MIC also steadfastly refused to communicate constructively with City on a related but broader point: the amount of coverage that it considered to be available to replace Building 25 under the functional replacement endorsement. Under the terms of the endorsement this question broke into two elements: (1) What sort of structure would constitute a functionally equivalent replacement for Building 25 in accordance with the terms of the policy, and (2) what would it cost to build such a structure? Hagerty testified that as of January 28, 2003, he considered the "[t]he issue" on coverage to be that "it looked like we were going to be at serious variance on the amount of the claim." Yet nothing was done to get at the root of this variance, to communicate with City concerning it, or even to adopt a coherent analysis of it. Instead, MIC asserted on April 30, 2003—five months after the fire—that it had "not yet determined a position concerning the amount of loss under any of the valuation methods presented in the policy." It went on to insist, in the ostensible voice of Boczar, that it had no obligation to make such a determination until *after* City entered into a contract: "I will not do so until I

have reviewed the claim presented by the City . . . ." The letter alluded to Boczar's mention of "possible ranges" in his January 27 meeting with Lee and Jackson, in which "I did say that I thought the cost of an 18,000 square foot metal building erected on a concrete slab might cost between $950,000 and $1,100,000." However the court was entitled to find that this had been no more than a bargaining figure. Even the April 30 letter did not suggest that it was in any sense firm. The trial court was entitled to find that MIC at no time made or communicated a good faith determination of the cost to construct a functional replacement building, and that this failure constituted a violation of its duties to its insured.[26]

The trial court also predicated an estoppel on MIC's causing, through Boczar, a complete breakdown of communications. In its intended decision the court found that "Claims adjuster Jack Boczar engaged in a pattern of dilatory and accusatory behavior that included . . . failing to acknowledge or return communications from the City within the time limits set forth in the Fair Claims Handling Regulations." In its statement of decision this finding was modified slightly to state that Boczar failed to respond "in a timely manner." The evidence established that it was common for MIC to take an inordinate time to generate written correspondence to City. Its letter of January 8, the chief functions of which were to put in play the demolition defense and impart written notice of the terms of the functional replacement endorsement, was at least nine days in preparation, an amended draft having been promulgated on December 30. The saga of MIC's response to Hurley's letter of February 10 includes such a remarkable series of claimed blunders and narrative inconsistencies that the trial court would have been entitled to infer something worse than a comedy of errors. Hurley's letter ended the first stage of its journey languishing in Boczar's old mailbox due to Boczar's failure to leave forwarding instructions. On February 28, Hurley faxed another copy to Boczar who, inferentially, forwarded a copy to Hagerty. Hagerty professed to have instructed Boczar to make sure a response went out the next day, but nothing of the kind occurred, at least in part because, as usual, the initial draft was written by MIC's Attorney Bailey, who did not

---

[26] On December 4, 2002, Boczar had engaged engineer Swensen to, as stated in Boczar's memorandum to the file, "obtain pricing for a structure of 19,084 SF metal building that would contain a gym with fir flooring meeting today's building codes." On December 12 Boczar reported that Swensen's "initial figures" were "comming [*sic*] in at $1.1 to $1.2 Million," but omitted fir flooring for the "gym/auditorium." Swensen reportedly believed that he could add the fir flooring but "still bring in the building for the high of $1.2." The evidence does not disclose whether this hope was borne out. It does show that Boczar attempted to chisel even this number down, asking Swensen to "continue working on his figures as that seem [*sic*] a little high. I thought that re[placement] figure would come in at just under $1 Mil." So far as the record shows, Boczar pulled this number out of the air. The trial court was thus entitled to conclude that the only credible estimate in MIC's possession exceeded the range Boczar mentioned to Lee and Jackson.

finish it until sometime in mid-March. On March 13, apparently, the draft went to Boczar. No response was forthcoming, even though Hurley wrote three letters to Boczar in the following eight days, complaining of the delay and demanding a written response in five days. Inexplicably, Boczar did not sign for these letters until April 8, whereupon—he testified—he "lost" them. Apparently he also forgot all about them, as well the February 10 letter—as, apparently, had Hagerty—since no one at MIC did anything further until Hurley called Hagerty's supervisor on April 29, nearly 10 weeks after he had written requesting answers. Hurley faxed copies of the three newest letters to Hagerty, and finally, on April 30, MIC promulgated a reply to the letter Hurley had sent some 79 days earlier.

Given this background it verges on fantastic that MIC attempts to blame the failure of communications on City's supposed refusal to "follow[] the written instructions" in the January 30 letter. MIC lends this suggestion what color it has only by torturing the last paragraph of the letter, which reads, "Please contact me after Monday, February 3, 2003 if you wish to discuss this matter, as I am currently in process of a physical office move until that time. If you need assistance in the interim, feel free to contact John Hagerty, telephone number [omitted], at Monterey Insurance Company's Home Office in Monterey." MIC professes to find in this language "instructions" to communicate by telephone rather than written correspondence, and to call Hagerty, not Boczar. Elsewhere MIC describes this language as "advis[ing] the [C]ity that [Boczar] was moving out of Monterey's Visalia office and that Hagerty was on telephone stand-by to help the City . . . ." The letter said nothing about a geographical move; it said only that Boczar was making a "physical office move," which for all the recipient knew could mean that he was going to another floor or down the hall. Moreover, the recipient was not told to "call" Hagerty, but to "contact" him, and only if it was necessary ("if you need assistance") "*in the interim*," i.e., until February 3, when the move would be complete. Nothing in the letter warned that correspondence mailed to Boczar might sit in his post office box for weeks, or might simply be "lost" by him, or that MIC might take weeks to reply once a missive somehow managed to come to its attention. MIC's conduct in this particular was at best grossly negligent and is more than sufficiently blameworthy to support the imposition of an estoppel.

Assuming the trial court credited MIC's explanation for this delay, the best that could be said for it is that it reflected a cavalier attitude toward MIC's insured and toward the difficult burden placed on City by the contracting condition—a burden that could quickly become impossible to carry within the allotted time if critical questions went unanswered. But the trial court did not have to credit MIC's explanation. It was entitled to infer that MIC, through Hagerty and Boczar, had adopted a deliberate strategy of obstruction and

delay with the very objective of preventing City from satisfying the contracting condition and, with luck, inducing it to abandon any hope of receiving the functional replacement coverage for which it had paid. Either way this conduct, which generated several months of delay, furnished still more grounds for holding MIC estopped to assert the contracting condition as a bar to recovery.

■ In sum, the trial court properly found that MIC engaged in conduct sufficient to sustain an estoppel in that it (1) failed to communicate with City at all concerning several crucial issues under the policy, including City's entitlement to functional replacement benefits, the amount of such benefits, the policy limits, and whether the building was a total loss; (2) erected phantom doubts about City's right to recovery and refused to seek in a timely manner to resolve them; (3) explicitly refused to respond to reasonable inquiries until such time as City might have entered into a contract binding itself to pay to repair or replace the building; and (4) caused, actively or through gross negligence, inordinate and inexcusable delays in communication.

## B. *Causation*

■ The function of estoppel is not to punish but to relieve one party from the harm caused by another's inequitable conduct. It seeks not to make an example or to vindicate an abstract principle, but to restore a balance of rights and responsibilities in a situation that has become unbalanced due to one party's unfair conduct. Thus, inequitable conduct alone will not sustain an estoppel. It must appear that the conduct of the party to be estopped *caused* the party seeking the estoppel to suffer some harm, disadvantage, or change of position, of sufficient gravity to justify the intervention of equity.

The trial court was entitled to find that the conduct described in the preceding part harmed City by rendering it practically impossible, or at least unreasonably difficult, for City to comply with the requirement that it enter into a replacement contract within 180 days or, as ultimately extended by MIC, 240 days. The trial court could reasonably find that so long as MIC refused to say whether it would honor a claim for functional replacement benefits, City could not comply with the condition. In essence MIC was promising to deny coverage if City did *not* enter into a contract, and threatening to deny coverage if City *did* enter into a contract. This forced City to a choice between certainly forgoing the coverage it had bargained for, and possibly going without that coverage *while incurring liability to a third party*. If City chose the latter option and MIC refused to pay, City would be left with an obligation to pay the amount it had contracted for, or at least to pay the contractor's lost profits. As Hurley quite reasonably observed

in his letter of March 21, 2003, "We cannot enter into contracts with the uncertainty created by the lack of adjustment of this loss to date."

MIC attempted to respond to this point below by suggesting that City could have entered into a contract that was itself *conditioned on* City's successful assertion of coverage under the functional replacement endorsement. The trial court was not obliged to find that this was a realistic option; indeed, we see no evidence on which to base such a finding. MIC tried to elicit testimony to this effect from City Attorney Elaine Cass, who testified in her deposition that so far as she knew, no contractor would hold a contract open for more than 30 or 60 days, and that the idea of a construction contract contingent on later allowance of an insurance claim was "just not, it's not in the realm of reality." At trial she conceded that she had "never researched" such a possibility. Shortly thereafter she was asked whether, during the two months following the fire, there was "anything preventing a proposal being made to the city council for the replacement or repair of building 25 conditional on [the] funding source being insurance proceeds." She replied that during the period contemplated by the question, City did not yet even know whether the object of the contract was to be the replacement of the building or only its repair. She went on to say that there was at that time "no identified funding source for repair or replacement . . . ."[27] No other reference was made at trial to the feasibility of entering a conditional replacement contract. As a result there was no evidence to contradict Cass's deposition testimony, admitted without objection or limitation, that such a strategy was "not in the realm of reality." MIC's suggestions to the contrary are, on this record, pure conjecture. We cannot overturn a judgment on the basis of mere hypothesis and surmise.[28]

---

[27] The parties debate at length whether the City could lawfully enter into a replacement contract, without an assurance of reimbursement from MIC, in view of the constitutional prohibition against any city's incurring an "indebtedness or liability . . . exceeding in any year the income and revenue provided for such year . . . ." (Cal. Const., art. XVI, § 18.) We do not reach this question. The trial court found that City "did not possess sufficient funds to 'front' the cost of replacing Airport Building no. 25 and did not enter into a contract to replace the building because it was concerned that [MIC] would deny its Functional Replacement claim based on Mr. Boczar's statement that he would fight any such claim and [MIC's] subsequent failure to respond to the issues raised in the February 10, 2003, March 18, 2003, and March 21, 2003, letters." Since there was no basis for the "fight" statement or the other conduct the trial court was entitled to find inequitable, this was a finding that such conduct in fact caused City not to enter into the required contract. The constitutional provision might have provided a further *legal* impediment to such a contract, but on this record it is unnecessary to reach that issue.

[28] In posttrial argument, counsel for MIC suggested "that the city counsel [*sic*] or the city manager [c]ould . . . have pursued a contingency or conditional contract as explained by Chuck [Swensen] at trial." It is unclear what counsel meant by the concluding phrase. We see no testimony from Swensen remotely touching on any "contingency or contingent contract."

Further, we fail to see how City could enter into a replacement contract, contingent or otherwise, while MIC refused to communicate the *amount* of available coverage, or to propose any method for City to ascertain that amount. As we have already noted, the trial court was entitled to find that for the first several months of the contracting period, MIC had not even told City that it considered the building a total loss. As then Director of Public Works Clint Quilter testified, City needed that information before it could determine what kind of plans to draw.[29] Even after MIC revealed that it deemed the building a total loss it is difficult to see how anyone in City's position could have known what kind of contract would satisfy the contracting condition. To do so, the contract would have to "restore the building to the same occupancy and use." But with MIC withholding judgment on what constituted a suitable replacement, and indeed refusing to acknowledge that *any* claim would be allowed, City could hardly dare to hazard a guess as to what MIC might claim to be the building's prefire "occupancy and use." Similarly, the policy limited City to recovering "the cost to replace the damaged building . . . with a less costly building that is *functionally equivalent* to the damaged building." As senior MIC supervisor John Costa conceded, the policy nowhere defined the term "functionally equivalent."[30] Without guidance from MIC, City was forced to guess, and to gamble funds that it did not have on the correctness of

---

Counsel apparently meant to say only that City could have entered into a contract of the type described by Swensen, but made conditional on funding. Counsel's statements are not evidence.

[29] The policy provides that if the building is a total loss, the contractual measure of benefits is "the cost to replace the damaged building on the same site, with a less costly building that is functionally equivalent to the damaged building." If the damage is only a "partial loss," the measure is "the cost to repair or replace the damaged portion of the building with less costly material, if available, in the architectural style that existed before the loss or damage occurred . . . ." Without knowing whether the building was a total loss, City could not know whether to work toward a contract to build a new structure or one to repair the fire damage "in the architectural style that existed before" the fire.

[30] MIC emphasizes the trial court's statement in the intended decision that "the Policy terms, including the 180 day provision," were "clear and unambiguous." This statement is not repeated in the court's formal statement of decision. Nor can it have been intended as broadly as MIC supposes. No issue concerning the meaning of the policy had been directly tendered to the court. The function of the quoted statement was to establish that the 180-day provision appeared enforceable by its terms, such that the only question was whether MIC would be heard to assert it. Thus the court went on to write that "neither the 180 day provision nor the Policy as a whole violated public policy," and to conclude that "the Policy's 180 day provision was enforceable, and the pertinent issue before the Court is whether Monterey is estopped from relying on the provision . . . ." MIC's insistence that the policy terms were unambiguous in all respects is thus misplaced.

that guess. Only with the guesswork eliminated, or reduced to manageable levels, could City secure plans, followed by estimates or bids, followed by a contract.

MIC contends that City failed to demonstrate that it could and would have satisfied the contracting condition had MIC behaved differently. It alludes repeatedly to a city building moratorium that, according to MIC, would have barred City from constructing a replacement building in any event. MIC's chief contention is not that the moratorium barred compliance with the contracting condition.[31] Rather MIC suggests that the moratorium furnished a motive for City to "stall," and that it is this motive, not MIC's conduct, that explains any delays in entering into a replacement contract. The short answer to this suggestion is that however colorable such an interpretation of the evidence might be, nothing before this court would justify our adopting it in derogation of the trial court's judgment and findings.

Nor does the record substantiate the premise that the moratorium would prevent City from entering into a replacement contract. At the core of MIC's discussion of this point are the propositions that (1) City was prohibited from undertaking the construction of a replacement building if it would increase the number of plumbing fixtures connected to City's sewer lines; and (2) to comply with modern building codes, a functional replacement for Building 25 would require more toilets than Building 25 had. Neither premise is borne out by the record. By its terms, the ordinance effecting the moratorium prohibited City from issuing a building permit for "1) the construction of *new commercial, residential, or industrial* buildings which require *connection to the City sewer system*; 2) the construction of a new *dwelling* unit; 3) a building *addition* which includes the installation of a new plumbing fixture unit . . . ." (City of Hollister Ordinance No. 974 (adopted May 20, 2002) § 3.)[32] None of these categories obviously applies to a structure *replacing* an *existing municipal* building that *already has* a "connection to the City sewer system." Counsel for MIC sought to impose a broader meaning on this prohibition by getting City Attorney Cass to testify that under the moratorium, "there cannot be the issuance of any building permit that . . . includes the installation of a new plumbing fixture unit." This is not what the ordinance says, and not surprisingly, Cass refused to accede to it. She was confident that a replacement for Building 25 would be permitted; the only question was whether the intensity of the building's use could be *increased* if, e.g., it were mitigated by

---

[31] One possible explanation for the obliqueness of MIC's discussion of this point is that if the moratorium were viewed as making performance of the contracting condition *legally impossible,* it might furnish an independent ground for excusing City from performing it. (See Civ. Code, § 1511, subd. 1.) Needless to say we do not address this possibility.

[32] At some unspecified point the ordinance was superseded by a cease and desist order from the regional water quality board. The text of the order does not appear in the record, though Cass testified that it "tracks the language" of the ordinance.

low-flow fixtures. The nearest she came to supporting MIC's premise was to acknowledge that it was "possible" the planning commission would not permit a replacement building to have an increased number of toilets "unless, again, there could be a showing of low flow fixtures installed."

Nor does the record sustain MIC's premise that the moratorium would permit six toilets (which is what a new building would require) only if there had been six toilets in Building 25. The moratorium speaks not of toilets, but of "plumbing fixture units." (City of Hollister Ordinance No. 974, § 3.) "Fixture unit" is a term of art referring to the relative burden imposed on a plumbing system by various uses or devices. (See Cal. Plumbing Code (2007) § 208.0, p. 18 ["fixture unit" defined as "[a] quantity in terms of which the load-producing effects on the plumbing system of different kinds of plumbing fixtures are expressed on some arbitrarily chosen scale"].) Even if the drafters of the moratorium meant to refer to plumbing fixtures, there is no basis to suppose they meant only toilets. In ordinary usage a "plumbing fixture" may include a sink, bathtub, or washing machine as well as a toilet. (See *id.,* § 218.0, p. 22 ["plumbing fixture" as "[a]n approved-type installed receptacle, device, or appliance that is supplied with water or that receives liquid or liquid-borne wastes and discharges such wastes into the drainage system . . ."].) Although no witness professed to have counted the plumbing fixtures in Building 25, Swensen's photographs depicted one kitchen sink and two washing machines in addition to bathroom fixtures. The only photo of bathroom fixtures does not depict any toilets, but shows a sink and what appear to be three spaces for urinals that have been removed. There was no evidence from which to infer that these other fixtures—the kitchen sink, the washing machines, and the removed urinals—would have been disregarded in determining the number of fixtures to be allowed in a replacement building.

Nor does the record establish the number of toilets in Building 25. The transcript pages cited by MIC contain only the compound and qualified question, "[D]id you see *six or eight functional* toilets when you inspected the loss, the day or two after the fire?," to which engineer Swensen replied simply, "No." This testimony was so ambiguous that it could, and probably should, be disregarded altogether. Indulging the charitable assumption that it meant Swensen had seen fewer than six "functional toilets," it is still pregnant with the possibility that there were six or more *toilets,* and nothing in the record permits us to suppose that in applying the moratorium, a nonfunctioning toilet would be treated as nonexistent.

In sum, there was no basis to conclude that the moratorium on new sewer connections presented any impediment to City's entry into a contract to construct a functionally equivalent replacement building.

MIC implies that the trial court's finding of causation rested in part on the premise that MIC in effect denied City's claim in the letter of July 2, 2003. MIC asserts that this was "serious error" because the court had admitted the letter only to establish "that no further extension of time was granted." It appears, rather, that the court excluded the letter altogether. Either way the ruling is difficult to understand. City's only coherent ground of objection was hearsay. When MIC later sought to place the letter in evidence, it is doubtful that it intended to rely on it to prove the truth of the matters asserted in it. Indeed it is doubtful that those matters, which consisted largely of legal conclusions and contentions, were subject to evidentiary proof. However, MIC does not attempt to demonstrate any prejudice from the letter's exclusion, only from the court's supposed "cutting off [of] questioning on the subject." (See Evid. Code, § 353.) This is not what occurred. Counsel began questioning the witness about the letter, then offered the letter into evidence, and when the court ruled the letter inadmissible, declared, "I have no further questions." Thus, while the letter appears relevant for nonassertive purposes and admissible over a hearsay objection, its erroneous exclusion is not effectively challenged, and the challenge actually predicated on that ruling is not sustained by the record. In any event the letter seems at best marginally significant.

MIC may also be understood to imply that City's own contracting procedures would have prevented it from satisfying the contracting condition even if MIC had fully cooperated in its efforts to do so. In this connection MIC quotes a statement from Hurley's letter of June 13, 2003, here italicized in context: "The City's engineering and architectural consultants have indicated that, even on the fastest of fast tracks, specifications and architectural drawings cannot be completed by July. Additionally, even if they could be completed, the design review, airport commission review, and architectural review cannot be completed by July. Even if those could be done, the public contracts open bidding process cannot be completed by July and a contract cannot be entered. *Even if the City had started this process on the day after the fire, they could not have completed the process.* As already stated, the reason for the delay to this point has been solely the responsibility of [MIC], who went off on a tangent claiming that the City officials were dishonest, the City intended to demolish the building, and they had 'witnesses' who could testify the City intended to demolish the building." MIC suggests that the sentence italicized here reflects a belief that it was "impossible" for City to enter into a replacement contract within 180 days under any circumstances. Later it writes that the sentence indicates that "[municipal] regulations prevented [City] from entering a contract within the time limits," such that the failure to contract "arose from its status as a governmental entity, not from its choice of insurance carrier." Although this language rather obscures any pertinent point, it seems apparent that if Hurley's statements were found

to be true, and to bear the meaning MIC implicitly imputes to them—that internal procedures would preclude City from ever negotiating and entering a building contract in 180 days or less—then it would be impossible to find that MIC's conduct prevented City from entering into a contract.[33]

Again, however, none of the factual premises necessary to such an argument can be adopted as controlling on appeal. The trial court found that City was "ready and willing to enter into a contract . . . within the Policy's 180 day deadline," but was "prevented" from doing so by MIC's conduct. There was substantial affirmative evidence to this effect. City Attorney Cass testified that she "never doubted" that a contract could be entered in 180 days, "although it would be close." Boczar reported that in his January 28 meeting with Lee and Jackson, Jackson said that the 120 days then remaining in the contracting period "did not give the city enough time to do anything *other than a turn key* [*sic*] *bid proposal* for the replacement of the building." (Italics added.) City's then director of public works, Clint Quilter, testified that on a "standard timeline," it takes "up to seven months" to "enter into a contract for a public works" building. However, depending on the complexity of the project, he had been able to enter into public works contracts in less than 180 days. He testified specifically that with respect to Building 25, "it would be possible to get it completed within 180 days" by having "expedit[ed] meetings and those sorts of things . . . ."

Quilter further testified that he instructed a city engineer, Steve Wittry, to prepare a flow chart showing the time it would take to get into a contract "do[ing] it as quickly as possible following normal procedures." The trial court could reasonably understand the chart to mean that the minimum time to reach a signed contract under normal procedures would be 249 days. However, Wittry testified that many of the steps contemplated by the chart could be compressed. As MIC concedes, Wittry's testimony could be reasonably understood to mean that City could enter into a contract in about 100 days.

The only question, then, is whether the comment in Hurley's June 13 letter somehow eclipsed all of the above evidence and barred the court from finding that the City could have satisfied the 180-day contracting condition. MIC offers no cogent ground on which to answer this question affirmatively. The trial court may have been entitled to conclude that while Hurley chose his words carelessly, all he meant to say was that *given MIC's obstructiveness,* City could not have completed the contracting process even if it had immediately set out to do so. It is true, as MIC emphasizes, that Hurley went

---

[33] MIC states in its brief that Hurley "chose not to testify." But Hurley was in the courtroom throughout the trial. We know of nothing that would have prevented MIC's counsel from calling him to the stand, or handing him a subpoena if necessary.

on to propose a further extension of the contracting deadline by one year. This request is difficult to understand; it smacks of desperation, and might well be explained by a belief on Hurley's part that City could not possibly enter an agreement within the 180 days allowed by the policy. But assuming Hurley held that belief and was injudicious enough to communicate it to MIC, it does not follow that City could not prove, and the trial court could not find, that Hurley was wrong. The June 13 letter was not a pleading from which Hurley's client might thereafter be forbidden to vary. (See 4 Witkin, Cal. Procedure, *supra*, Pleading, § 415, p. 512 [effect of judicial admissions].) Nor could MIC have plausibly contended that it detrimentally relied on Hurley's statement. A more fitting description of the facts, as the trial court was entitled to find them, was that MIC *pounced* on Hurley's unfortunate statement as a sign that it had achieved its objective, which was to deter the City from successfully asserting a right to functional replacement benefits. If MIC wanted to prove the City's inability to satisfy the contracting condition, it ought to have performed its own obligation to cooperate in, rather than obstruct, the City's attempt to do so.

## C. *Cases from Other Jurisdictions*

Although the foregoing conclusion flows directly from principles of California law, we find further support in six sister-state cases whose applicability is a subject of dispute between the parties. In *Conrad Brothers v. John Deere Ins. Co.* (Iowa 2001) 640 N.W.2d 231 (*Conrad Brothers*), insured buildings were damaged in a windstorm. The insurer announced that it would not pay replacement benefits because the claimant, a mortgagee of the insured, was not named as a payee in the relevant portion of the policy. The claimant sued, arguing among other things that the insurer's "refusal to acknowledge any responsibility for coverage" excused the claimant from a condition requiring it to rebuild. (*Id.* at p. 235.) The trial court awarded damages, ruling that the claimant "complied with the provision requiring notice of intent to seek replacement costs within 180 days of the loss and it was reasonable for it not to perform the condition requiring the repairs to be made because [the insurer] had denied any coverage." (*Ibid.*) The Iowa Supreme Court affirmed. It noted that the lower courts had relied on a theory that the insurer had prevented performance of the rebuilding condition, but that this would ordinarily only operate to *suspend* the operation of a condition, not excuse it altogether. (*Id.* at pp. 240–241.) However, where a party *repudiates the contract* before the other's performance is due, he thereby excuses the other party entirely from performing conditions, permitting him to bring suit immediately. (*Id.* at p. 241.) The insurer had repudiated the contract by "den[ying] any coverage on the claim . . . ." (*Id.* at p. 242.) The trial court found on substantial evidence that the claimant would have performed the condition but for the repudiation. (*Ibid.*) Accordingly, the insured was entitled

to recover the replacement value in cash notwithstanding that the insurer's conduct had been free of apparent bad faith. (*Ibid.*)[34]

In *Ward v. Merrimack Mut. Fire Ins.* (Super.Ct.App.Div. 2000) 332 N.J. Super. 515 [753 A.2d 1214] (*Ward*), the alleged insurer of a burned building denied all liability on the ground that a binder asserted in lieu of a policy was forged after the fire and that it would never have insured the building under its guidelines. (*Id.,* 753 A.2d at p. 1217.) The jury found the insurer bound, and awarded the market value of the building, but the trial court refused to allow recovery of replacement costs because the insured had failed to repair or replace the building, as required under the hypothetical policy. (*Ibid.*) In overturning this disposition the reviewing court wrote, "A party to a contract may not avail itself of a condition precedent where by its own conduct it has rendered compliance therewith impossible," and added, "Applying this equitable rule, courts in other jurisdictions have held that an insurer is estopped from arguing that an insured cannot demand replacement costs under a policy provision requiring actual replacement of the damaged property as a precondition to recovery where the insurer's conduct frustrates the insured's ability to satisfy the precondition." (*Id.* at p. 1218.) This principle was applicable whether or not the insurer acted in bad faith. (*Id.* at p. 1219.) However, it must appear "in fact" that the insurer's conduct "was the cause of [the insured] not replacing the structure . . . ." (*Id.* at p. 1220; see *ibid.,* quoting 5 Williston on Contracts (3d ed. 1961) § 677 ["To excuse the condition precedent, the facts must show that 'the promisor [insurer] has caused the non-performance of the condition. . . . If the promisee [insured] could not or would not have performed the condition, or it would not have happened whatever had been the promisor's conduct, the condition is not excused.' " (Italics omitted.)].) The matter was remanded for a trial on replacement value and other issues. (753 A.2d at p. 1221.)

In *Dickler v. CIGNA Property and Cas. Co.* (3d Cir. 1992) 957 F.2d 1088 (*Dickler*), a building was damaged by fire while insured under a policy that allowed the policy holder to recover the building's "actual cash value" and, if he rebuilt within a year of the loss, its "replacement cost." (*Id.* at p. 1091.) The policy holder, who had contracted to sell the building before the fire, transferred it to the buyer, including an assignment of the seller's rights under the policy. The assignee, which did not have a copy of the policy, hired its own adjuster who attempted to obtain one; the insurer "did not respond and took no action to adjust the loss." (*Ibid.*) The adjuster engaged a contractor

---

[34] The court noted that the reason for requiring actual repair or replacement as a condition of recovering the cost thereof is "to prevent an insured from making a profit from a loss." (*Conrad Brothers, supra,* 640 N.W.2d at p. 240.) Without such a requirement, "an insured can profit by receiving replacement costs which are not then used to replace property which depreciated in value prior to the loss." (*Ibid.*) Requiring the insured to spend this money on repair or replacement removes an incentive to commit fraud (and worse).

who estimated the replacement cost of the entire building and the percentage of the building destroyed, but not the building's actual cash value. (*Id.* at p. 1092.) His report was sent to the insurer, which "still took no action to negotiate with the [insured]." (*Ibid.*) However, it engaged an appraiser who, without knowing by what formula the cash value was to be determined under the policy, secretly concluded that it was zero. Meanwhile the insurer refused another request, this time from the assignee's lawyer, for a copy of the policy. About a year after the fire, the insurer asked the assignee to present a proof of loss within 60 days. The assignee presented an engineer's estimate of the building's replacement cost. The insurer rejected the claim for lack of compliance with the formula set forth in the policy, a copy of which it had still not provided. (*Ibid.*) An action followed in state court, concluding with an agreement that the assignee would submit a new proof of loss complying with a policy the insurer had produced in that action. (*Ibid.*) After that action was dismissed, the assignee learned that the policy produced in state court was not the one in effect at the time of the fire. (*Id.* at p. 1093.) This led to a new proof of loss and a second suit by the assignee in federal court. In response to the assignee's claims of breach of contract and bad faith, the insurer argued, as pertinent here, that not having rebuilt in time, the assignee could recover no more than the actual cash value, which was zero. (*Ibid.*) At trial the assignee testified that he had originally acquired the property with the intention of demolishing the building and constructing single houses, but had changed his mind due to a market downturn and had intended to transform the building into a nursing home. (*Ibid.*) The district court found that the assignee "had intended to repair the damaged building but had not possessed the financial resources to finance those repairs because CIGNA had wrongfully refused to adjust the loss and to pay the building's actual cash value." (*Id.* at pp. 1093–1094.) It entered judgment for the assignee in the amount, as relevant here, of the replacement cost as calculated by its adjuster. (*Id.* at p. 1094.) The Third Circuit Court of Appeals held this to be error, but directed a modification of the judgment to provide that the assignee would have one year to rebuild, and thereby recover replacement value, starting when the insurer paid the actual cash value. (*Id.* at p. 1096.)

In *Bailey v. Farmers Union Co-op. Ins. Co. of Nebraska* (1992) 1 Neb.App. 408 [498 N.W.2d 591] (*Bailey*), a supervising adjuster "mistakenly presumed" in the early stages of a claim that the destruction of the insured's home by collapse during renovation was not covered under her homeowner's policy. (*Id.*, 498 N.W.2d at p. 595.) Later there was "internal brainstorming about possible defenses" to her claim, but the only defenses ultimately raised were that she had failed to satisfy certain procedural requirements under the policy, including that she claim replacement costs within 180 days of the loss.

(*Ibid.*) Although the insurer appeared to have internally conceded the substantive merit of the claim, in dealings with the insured it insisted that the claim was " 'doubtful and disputed.' " (*Id.* at pp. 595, 596.) After the insured rejected a settlement offer limiting her recovery to the actual cash value of the home, an adjuster told her attorney "that the actual cash value figure was the total value of the claim and that Farmers Union would not cover repair and replacement costs." (*Id.* at p. 596.) The trial court found that the adjuster was lying when he testified at trial that the company had always intended to honor a replacement cost claim, that the insurer's conduct was " 'replete with bad faith,' " and that the insurer's "intransigence" prevented the insured from complying with the requirement that she "rebuild and claim replacement costs within 180 days of the loss . . . ." (*Id.* at p. 597.)

On appeal the insurer cited authorities upholding the right to enforce a contracting condition "as a means of preventing fraud by the insured . . . ." (*Bailey, supra,* 498 N.W.2d at p. 598.) The reviewing court distinguished these cases because none of them "addressed the scenario in which the insured failed to meet a time deadline because of the interference of the insurer." (*Ibid.*) The insured was prevented from complying, wrote the court, "by [the adjuster's] insistence that [the insured] was entitled to receive nothing more than actual cash value. [The insured] could not proceed with rebuilding as long as Farmers Union refused to commit itself to future reimbursement of [the insured] for rebuilding costs. She did not have the money to initiate rebuilding on her own, and she would not have been able to secure a loan without the assurance by Farmers Union that additional replacement costs would be covered up to the policy limit. Though required to do so under the policy, Farmers Union never made that commitment." (*Ibid.*) "[The insured] was prevented from satisfying the condition of rebuilding and claiming costs within 180 days by Farmers Union's refusal to assure Bailey that, in addition to the actual cash value figure, the cost of rebuilding her home would be covered up to the policy limit." (*Ibid.*)

In *Pollock v. Fire Ins. Exchange* (1988) 167 Mich.App. 415 [423 N.W.2d 234] (*Pollock*), the insurer delayed resolution of the plaintiff's claim for the actual cost value of a house for some 25 months, and then contended that the plaintiff had no right to replacement cost because she had failed to rebuild her home within the time allowed by the policy. The trial court found that the insurer's "delay had made it impossible for plaintiff to comply with the policy provisions," and that it would be "inequitable to penalize the plaintiff when defendant's twenty-five month delay in paying any substantial amount prevented plaintiff from rebuilding her house." (*Id.,* 423 N.W.2d at p. 235.) The reviewing court noted that in addition to the language of the policy, a Michigan statute conditioned the right to recover replacement costs on the insured's actually repairing or rebuilding the damaged property. (*Ibid.*) Nonetheless, the court concluded, "in the face of [the] lack of good faith

processing of plaintiff's claim, the trial court correctly chose to award the replacement cost value to plaintiff based upon equitable considerations." (*Id.* at p. 237.) "[D]efendant's failure to pay on the claim hindered, and quite possibly even prevented, plaintiff from complying with her obligation to repair or replace the building. Had defendant immediately paid in good faith the actual cash value of the loss, holding the additional amount due under the replacement cost provision in reserve until the replacement was made or contracted for, or had otherwise worked with plaintiff to insure her financial ability to immediately proceed with the replacement or repair, a different result might be called for. However, defendant did not work with plaintiff to promptly pay the claim and enable her to repair or replace the building; rather, it did as much as possible to hinder plaintiff and delay or prevent the payment of the claim. We will not now allow defendant to raise as a defense plaintiff's failure to perform an act which defendant itself greatly hindered plaintiff from performing." (*Ibid.*)

In *Zaitchick v. American Motorists Ins. Co.* (S.D.N.Y. 1982) 554 F.Supp. 209, the plaintiffs' home burned while they were on vacation. Investigations into the origins of the fire were inconclusive. (*Id.* at pp. 210–212.) The insurer refused to pay, and defended the ensuing suit on the grounds that the plaintiffs had fraudulently exaggerated their claim and that the fire was caused by arson. (*Id.* at p. 212.) The court rejected these defenses. (*Id.* at pp. 212, 215.) The insurer also contended that the insureds' failure to repair or replace the home barred any recovery of replacement value. (*Id.* at p. 216.) The court rejected this contention on equitable grounds, noting among other things the plaintiffs' unchallenged contention that "a bank would be chary to lend money on the basis of an unlitigated law suit in which the defendant and its vast resources intend to present several defenses to payment." (*Id.* at p. 217.) It distinguished cases cited by the insurer, noting that the insurers in all but one of them had paid actual cash value, so that the insureds had "at least some money with which to begin rebuilding their property." (*Ibid.*) Here the insureds had been "refused any monies under the insurance contract. Not surprisingly, they were unable to replace their home. This conduct by [insurer] made it impossible for plaintiffs to fulfill the condition precedent, and therefore, excuses plaintiffs from performance of the replacement condition." (*Ibid.*)

MIC challenges the applicability of these cases, first on the ground that they involved a breach of the insurer's contractual obligation to pay the damaged property's cash value, which in turn contributed to the insured's failure to commence rebuilding. This is far from clear. None of the quoted policy provisions required the insurer to pay cash value at any particular time. Insofar as they *impliedly* required payment of cash value at an early time, a similar term may be implied with equal force in the policy at issue here, and MIC's conduct—like that of the insurers in the cited cases—amounted to a

breach of that provision. The trial court could readily find that MIC sought to compel City to choose between a cash value settlement and the assertion of a claim (which MIC would "fight") for replacement value. This conduct does not differ materially from that held in the cited cases to bar the insurer's later assertion of a contracting condition.

MIC also asserts that "*none* of [these cases] arises from the concept of estoppel." (Original italics.) We beg to differ. Admittedly, the court in *Bailey, supra,* 498 N.W.2d 591, had no occasion to consider estoppel because it awarded the plaintiff a judgment for damages based on the insurer's bad faith conduct. But in *Zaitchick v. American Motorists Ins. Co., supra,* 554 F.Supp. at page 216, the plaintiff contended that the insurer was " 'estopped' " by its conduct. While the court did not adopt that analysis explicitly, it did so implicitly by writing, in the succeeding paragraph, that "both case law and *equitable considerations* render replacement cost the appropriate method of valuing plaintiffs' damages." (*Id.* at p. 217, italics added.) Likewise, although the court in *Pollock, supra,* 423 N.W.2d 234, never used the term "estoppel," the judgment there rested on the trial court's finding that it would be "inequitable to penalize the plaintiff when defendant's twenty-five month delay in paying any substantial amount prevented plaintiff from rebuilding her house." (*Id.* at p. 235.) The reviewing court quoted and adopted the reference to "equitable considerations" in *Zaitchick, supra,* 554 F.Supp. at page 217. (*Pollock, supra,* 423 N.W.2d at p. 236; see *id.* at p. 237 ["the trial court correctly chose to award the replacement cost value to plaintiff based upon equitable considerations"].)

In *Dickler, supra,* 957 F.2d 1088, the court concluded that "the equities" in the case at hand differed sufficiently from those in *Zaitchick,* to warrant a different result. (*Id.* at p. 1096.) But this meant only that the plaintiffs in *Dickler* were not entitled to a cash award of replacement value; they were still entitled to assert a claim for replacement value, and would be allowed an additional year in which to do so. (*Ibid.*) Such a disposition can only be explained as an exercise of equitable jurisdiction, resting implicitly on concepts of estoppel.

The court in *Ward, supra,* 753 A.2d 1214, 1218, viewed cases of this kind as resting on a holding that "an insurer is estopped from arguing that an insured cannot demand replacement costs under a policy provision requiring actual replacement of the damaged property as a precondition to recovery where the insurer's conduct frustrates the insured's ability to satisfy the precondition." It went on suggest that the holdings actually rest "generally . . . on the theory of impossibility, that is, that the carrier's conduct made it impossible for the insured to satisfy the precondition." (*Ibid.*) This view was adopted from *Ward* in *Conrad Brothers, supra,* 640 N.W.2d at page 240.

In fact the cases appear to make no distinction between the two theories, presumably because both will typically apply and unless the parties raise an issue requiring a choice between them, there is no occasion to make one.

What MIC apparently means when it denies the role of estoppel in these cases is that they contain "no analysis to see if estoppel could be legally applied, and no examination of whether there was *reasonable* reliance on the misconduct of another to one's detriment . . . ." But this is a criticism of how they are written, not a reason to diverge from them. MIC may be understood to imply that these cases should not be followed in California because equitable estoppel in this state invariably requires evidence of detrimental reliance. But this is not an accurate statement of California law. Equitable estoppel requires that the inequitable conduct invoked for the doctrine be a cause of harm to the party asserting it, and in the case of affirmative representations this will usually translate into detrimental reliance by the person to whom the representations were made. But where the inequitable conduct is omissive in nature, or more complex—both of which characterizations apply here—the law will not invariably require reliance; indeed it would be nonsensical to do so. One cannot "rely on" another's obstructionism or recalcitrance, but such conduct can nonetheless give rise to estoppel where it causes harm to another under circumstances like those the trial court found here.

MIC also attempts to distinguish the cited cases, or some of them, on the ground that the insureds there were sympathetic homeowners whereas this case falls within the dictum in *Dickler, supra*, 957 F.2d at page 1096, that a different result may be warranted in a case that "takes place in a commercial setting and involves relatively sophisticated parties." MIC contends that "there is no sympathy factor" here because City "own[ed] and insur[ed] dozens of commercial buildings, [bought] the same sort of specialized policies for years through an established insurance broker, [was] staffed with its own claims management personnel, and [was] represented not only by the city attorney (and whatever other attorneys were employed in her office) but also by coverage counsel." But assuming the proposed distinction might have some bearing in a proper case on the availability of equitable estoppel, the trial court was entitled to find that City was *not* a sophisticated insured in any sense relevant to this case, and that whatever MIC means by "claims management personnel," City officials and employees had no idea how to deal with the deluge of denials, evasions, delays, and threats generated by MIC's adjusters. Nor did this downpour abate with City's engagement of outside counsel. In any event, the distinction proposed by MIC has less to do with the propriety of equitable relief than with questions involving the *formation and interpretation* of the contract—questions not raised here.

## DISPOSITION

The judgment is modified to provide that the 180-day period provided therein will begin to run when this court issues its remittitur. This modification is without prejudice to such further modification as the trial court may elect to make in the exercise of its inherent equitable jurisdiction. As so modified, the judgment is affirmed. Costs to respondent City of Hollister.

Premo, J., and Elia, J., concurred.

A petition for a rehearing was denied August 28, 2008, and the opinion was modified to read as printed above.